**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-1447

SUMMER D. LASHLEY, Ph D

       Plaintiff - Appellant

v.

SPARTANBURG METHODIST COLLEGE; W. SCOTT COCHRAN; MARK W. GIBBS, Ph D; TERESA D. FERGUSON; JONATHAN J. KEISLER, Ph D; ANGELIA A. TURNER; CLEVON A. BOYD, in his individual capacity

       Defendants - Appellees.

Appeal from the United States District Court for the District of South Carolina, at Spartanburg.  Joseph Dawson, III, District Judge.  (7:18−cv−02957−JD)

Argued:  March 7, 2023                Decided:  April 18, 2023

Before WILKINSON, NIEMEYER, and KING, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Niemeyer and Judge King joined.

David Eliot Rothstein, ROTHSTEIN LAW FIRM, PA, Greenville, South Carolina, for Appellant.  Todd Russell Flippin, HOLCOMBE BOMAR, P.A., Spartanburg, South Carolina, for Appellees.

WILKINSON, Circuit Judge:

In 2017, Summer Lashley signed a one-year contract to teach criminal justice courses at Spartanburg Methodist College (SMC). Less than a year later, SMC decided not to renew Lashley's contract and terminated her shortly thereafter. Lashley brought a mix of state and federal law claims against SMC, essentially arguing that her contract non-renewal and termination were unlawful. The district court granted summary judgment in favor of SMC on all federal claims and declined to exercise supplemental jurisdiction over the state law claims. Lashley now appeals. Under the Americans with Disabilities Act (ADA), Lashley accuses SMC of discrimination, retaliation, and engaging in an unlawful health inquiry. Under Title IX of the Education Amendments Act of 1972 (Title IX), she accuses SMC of retaliation. For the following reasons, we shall affirm the district court.

## I.

## A.

In May 2017, Summer Lashley signed a contract to teach criminal justice courses at Spartanburg Methodist College and to serve as the Director of the Criminal Justice Program. Per the one-year contract, Lashley taught a full course load in the Fall 2017 and Spring 2018 semesters. During her time at SMC, Lashley was supervised by Mary Jane Farmer, the Chair of the Social Sciences Department, Mark W. Gibbs, the Dean of Instruction, and Anita Bowles, the Executive Vice President of Academic Affairs.

The facts relevant to this appeal can be divided into three sections: (1) facts underlying Lashley's Title IX and ADA claims, (2) facts pertaining to SMC's decision not to renew her contract, and (3) facts surrounding her termination.

2

1.

Lashley's Title IX retaliation claim stems from complaints she raised on behalf of students. Lashley informed SMC's Human Resources and Title IX Coordinator, Jenny Dunn, of several incidents between September and December 2017 in which she thought female students were being harassed by male students. These included reports of male athletes allegedly violating Title IX by sexually exploiting and bullying female athletes.

According to Lashley, some of these incidents involved SMC employees covering up any misbehavior. So Lashley, assuming the posture of whistleblower, felt compelled to take her concerns to HR personnel. *See* Opening Br. at 8 ("Lashley had been very outspoken in raising numerous injustices that she became aware of at SMC."). Lashley believed many students brought their issues to her because she was the Director of the Criminal Justice Program. She also claims not everyone at SMC was happy with her reports. Following one such complaint, Mark Gibbs allegedly confronted her and said he heard a rumor that Lashley told a female student to get an attorney. Gibbs denies this.

Lashley's ADA allegations originate from a series of incidents starting in January 2018, when Lashley complained of ostensible mold or mildew in her office building. Lashley claimed the mold exacerbated her respiratory problems due to her asthma. SMC's maintenance department brought these concerns to the attention of Gibbs and others. Gibbs met with Lashley at the end of January to discuss her health concerns.

During this meeting, Lashley claims that Gibbs was "angry" and stated, "tell me about your health issues." *Lashley v. Spartanburg Methodist Coll.*, No. 7:18-CV-02957-KFM, 2022 WL 872604, at *2 (D.S.C. Mar. 24, 2022). In response, Lashley informed

3

Gibbs that she suffered from Lupus, asthma, post-traumatic stress disorder, and severe gastrointestinal issues. *Id.* at *3. Gibbs denies demanding that Lashley tell him about her medical issues, J.A. 912, but he testified that he did meet with her to "assess what could be done to accommodate her health," *Lashley*, 2022 WL 872604, at *3. Gibbs offered to move Lashley's office to a different building a short walk away to address her concerns, but Lashley rejected this option.

On February 5, 2018, Lashley requested a reasonable accommodation form. HR Coordinator Dunn sent her the form, along with SMC's faculty handbook. Lashley responded via email a few days later and informed the HR department that she had been diagnosed with Crohn's Disease, that she had informed her supervisor of this diagnosis, and that she wanted the information to remain confidential. Despite her response, Lashley never filled out or returned the reasonable accommodation form.

2.

SMC eventually decided not to renew Lashley's contract for the following academic year. SMC claims this decision was the product of growing concerns regarding Lashley's performance, professionalism, and conflicts with faculty and students. Mary Jane Farmer, Lashley's direct supervisor, reported that though she was "pleased" with Lashley's job performance after the Fall semester, she noted a variety of problems. *Lashley*, 2022 WL 872604, at *2.

Farmer reported that Lashley exhibited a proficiency with course material, but her classes lacked structure due to inadequate preparation. Lashley complained that she did not have enough time to get ready for class, so Farmer advised Lashley to use the ten hours of

4

weekly office time to prepare. Yet Farmer worried that Lashley was instead spending this time fraternizing with students, calling Lashley's office a "student lounge"—a sentiment shared by other faculty. *Id.* Farmer further stated that Lashley maintained an unprofessionally close relationship with a work-study student. By late January 2018, Farmer described Lashley as "emotional, volatile, and [] uncontrollable." *Id.*

This was not the only cause for concern. Throughout Lashley's time at SMC, Gibbs received numerous complaints from Lashley about various students, faculty, and staff. The complaints were "quite regular" and suggested that Lashley was struggling to "settle[] into her position." *Id.* at *3. According to Gibbs, Lashley informed him on "multiple occasions that SMC was not a good fit for her." J.A. 575. Lashley's inability to work with others was demonstrated by the numerous conflicts that arose around her. The district court highlighted a few examples.

First, Lashley complained about her identity appearing in a SMC press release. She lodged this complaint even though she had consented to the use of her name. Next, Lashley appeared to have an ongoing conflict with Dale Hyder, an adjunct faculty member in the Criminal Justice Program. Gibbs observed that Lashley "had a personality conflict with Mr. Hyder" and "was allowing the conflict to disproportionately affect her job performance." *Lashley*, 2022 WL 872604, at *4. Farmer likewise described the conflict as a "petty thing between the two of them" that seemingly revealed a "professional rivalry." J.A. 853–54. Further, echoing concerns from other SMC faculty, Gibbs noted that Lashley had an inappropriately close relationship with her work-study student. She was spending

5

too much time with the student, even once requesting that the student drive to Lashley's home a good distance away to deliver teaching materials.

Lashley's multiple contentious interactions led Gibbs to worry that she was not forming constructive relationships with faculty and students and would have difficulty maintaining the professionalism required to perform as a SMC professor. In consultation with other SMC administrators, Gibbs decided not to renew Lashley's contract for the following year. On February 13, 2018, Gibbs informed Lashley that her contract was not being renewed, explaining that she "and SMC were not a good fit for each other." *Lashley*, 2022 WL 872604, at *4.

3.

Lashley did not take kindly to this news. Various employees at SMC reported troubling behavior from Lashley in the following three days. On the same day Lashley was notified of the decision not to renew her contract, Gibbs claims he saw Lashley cleaning out her office and taking boxes to her car. When he asked her what she was doing, she angrily shouted at him for betraying her. The following day, a professor who shared an office with Lashley testified that she overheard Lashley tell a group of students that she felt like "blowing the school up." *Id.* Then on February 15, another member of the faculty testified that Lashley spoke with him and said, "Bad stuff happens when people cross me. My dad says it's true. They turn up dead." *Id.* Lashley allegedly called certain individuals like Gibbs "evil people" who would "get theirs." *Id.*

Reports of these incidents made their way to SMC's President, W. Scott Cochran. Even though Lashley denies ever making these alleged remarks, President Cochran came

6

to believe Lashley's behavior revealed she was a threat to the safety of the SMC community. On February 16, 2018, Cochran made the decision to immediately terminate Lashley. He informed Lashley that her termination was due to "unprofessional, inappropriate interactions" with faculty. *Id.*

B.

After receiving a right to sue letter from the Equal Employment Opportunity Commission, Lashley brought suit against SMC on November 1, 2018. Her verified complaint alleged a mixture of state and federal law violations centering on her contract non-renewal and her termination.

On October 15, 2021, Lashley moved for sanctions against SMC, claiming it had failed to comply with her discovery requests. The same day, SMC moved for summary judgment. The magistrate judge issued a report and recommendation to grant summary judgment in SMC's favor on all federal law claims and to grant partial summary judgment on the state law claims. *See Lashley v. Spartanburg Methodist Coll.* (*Lashley R&R*), No. 7:18-CV-2957-JD-KFM, 2021 WL 8014689, at *32 (D.S.C. Dec. 20, 2021).

The district court adopted the report and recommendation, granting summary judgment in SMC's favor on all federal law claims. *Lashley*, 2022 WL 872604, at *10. The district court declined to retain supplemental jurisdiction over the remaining state law claims, which were thus remanded to state court. *Id.*

Lashley filed a timely notice of appeal, objecting to the district court's findings on four federal law issues. She now presses claims of (1) discrimination in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq.*; (2) retaliation in

7

violation of the ADA; (3) unlawful health inquiry in violation of the ADA; and (4) retaliation in violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681 *et seq*. She withdrew all other federal claims on appeal. Opening Br. at 4 n.1.

"We review the district court's grant of summary judgment de novo." *Equal Emp. Opportunity Comm'n v. McLeod Health, Inc.*, 914 F.3d 876, 880 (4th Cir. 2019). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We of course construe the evidence and reasonable inferences at this stage "in the light most favorable to the non-moving party." *McLeod Health*, 914 F.3d at 880; *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 460 (4th Cir. 2012). The "nonmoving party must demonstrate that a genuine issue of material fact exists 'by offering sufficient proof in the form of admissible evidence' instead of 'relying solely on the allegations of her pleadings.'" *Webster v. Chesterfield Cnty. Sch. Bd.*, 38 F.4th 404, 410 (4th Cir. 2022) (quoting *Guessous v. Fairview Property Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)).

## II.

We first address Lashley's ADA and Title IX retaliation claims. The ADA's retaliation provision prohibits "discriminat[ing] against any individual because such individual has" taken an action protected by the Act. 42 U.S.C. § 12203(a). Title IX lacks an explicit cause of action for retaliation, but the Supreme Court has held that "the private right of action implied by Title IX encompasses claims of retaliation." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171 (2005). In the absence of a statutory backdrop for evaluating Title IX retaliation claims, our circuit has looked to Title VII to provide an

8

applicable legal framework. *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 694 (4th Cir. 2018).

Under both the ADA and Title IX, the crux of a successful retaliation claim is that the plaintiff engaged in activity protected by law, and then, because of this, the defendant took an adverse employment action against him. *See Hurley*, 911 F.3d at 694 (explaining elements of Title IX retaliation); *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 577 (4th Cir. 2015) (explaining elements of ADA retaliation).

Lashley argues that she engaged in ADA-protected activity by requesting an accommodation for her disability. Opening Br. at 26. Lashley also asserts she engaged in Title IX-protected activity by helping female students raise complaints about SMC students and employees. *Id.* at 29. Because of these actions, Lashley argues, SMC retaliated against her by not renewing her contract and terminating her employment.

To prevail on her retaliation claims, Lashley must either offer "sufficient direct and indirect evidence of retaliation, or proceed under a burden-shifting method." *Smith v. CSRA*, 12 F.4th 396, 416 (4th Cir. 2021) (quoting *Jacobs*, 780 F.3d at 577). Lashley concedes that the "burden-shifting framework[] is applicable to [her] retaliation claims under both the ADA and Title IX." Opening Br. at 31–32. The "burden-shifting scheme set forth in *McDonnell Douglas*" proceeds in three steps. *Hux v. City of Newport News, Va.*, 451 F.3d 311, 314 (4th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Lashley must first make a prima facie showing of retaliation—*i.e.*, she engaged in a protected activity and was retaliated against because of it. *Jacobs*, 780 F.3d at 578. The

9

"employer then has the burden to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions." *Id.* (internal quotation marks omitted). "The burden then shifts back to [Lashley] to show that the proffered reason is pretext." *Id.* Importantly, Lashley "always bears the ultimate burden of persuading the trier of fact that she was the victim of retaliation." *Rhoads v. F.D.I.C.*, 257 F.3d 373, 392 (4th Cir. 2001).

When we analyze the case through this well-settled framework, it becomes clear that Lashley's retaliation claims cannot succeed. SMC offers nonretaliatory reasons for not renewing Lashley's contract and terminating her employment, and she is unable to demonstrate that SMC's reasons are pretextual. We therefore need not decide whether Lashley established a prima facie case, for assuming *arguendo* that she satisfied the first step of the burden-shifting framework, her retaliation claims still fall short. *See Hux*, 451 F.3d at 314 (assuming prima facie case when pretext was dispositive); *see also Engler v. Harris Corp.*, 628 F. App'x 165, 168 (4th Cir. 2015) (same in retaliation context). We first discuss SMC's proffered reasons before turning to pretext.

### A.

The record contains ample evidence of legitimate reasons not to renew Lashley's contract and to terminate her employment. SMC offered evidence showing the reason behind Lashley's contract non-renewal was that she was not a good fit for SMC. Additionally, SMC put forth evidence that the decision to terminate Lashley was based on reports of threatening and unprofessional behavior. We address each in turn.

10

1.

Regarding the decision not to renew Lashley's contract, SMC proffered evidence that Lashley had a hard time performing to its expected level of professionalism and collegiality. As noted earlier, several sources reported that Lashley was often at the center of conflicts with students and faculty, revealing that she struggled to form healthy relationships at SMC.

Multiple people at SMC complained of Lashley's unprofessional relationships with students. Faculty members complained that Lashley's office, which she shared with another professor, had become a "student lounge." *Lashley*, 2022 WL 872604, at *2. Students reported that Lashley was playing favorites with their classmates, requesting, for example, that a favored student drive to her house far from SMC. And Lashley's direct supervisor observed that Lashley was excessively fraternizing with students in ways that went beyond constructive mentoring and educational guidance. While there is obviously nothing wrong, and much that is right, with faculty conversing with students outside of class, Lashley's supervisor worried that the excessive familiarity inhibited Lashley's ability to prepare and consequently made her classes disorganized.

Lashley also clashed with multiple members of the faculty at SMC. For example, Gibbs observed that Lashley had difficulty working with her colleague Dale Hyder. Although she was Hyder's direct supervisor, she declined to talk through their problems. While the issues apparently arose from a personality conflict, the personal spat negatively impacted Lashley's job performance according to Gibbs. This and other repeated problems led Lashley's supervisor to describe her as "emotional, volatile, and [] uncontrollable."

11

*Lashley*, 2022 WL 872604, at *2. What's more, the record shows that Lashley herself was dissatisfied during her time at SMC, often complaining to Gibbs about various people and incidents. J.A. 575, 884. She sent emails in January stating that she "just ha[d] to get out of SMC" and that she was applying for new jobs "everywhere and determined to get the f*** out of there." *Lashley R&R*, 2021 WL 8014689, at *5.

Problems such as these are not unknown in institutional settings, and assessing fault and blame can become a complicated undertaking. At the same time, it was not wrong, much less unlawful, for a supervisor to conclude that Lashley's conflicts with faculty demonstrated a lack of conflict-resolution skills needed in a professional setting where interactions with colleagues are frequent and essential. Lashley's relationships with students similarly displayed a lack of professionalism and hurt her teaching abilities. An educational institution like SMC is justifiably sensitive to how its professors interact with students and faculty, relationships that often spell the difference between educational progress and its absence.

By the time Gibbs and others decided whether to renew Lashley's contract, the cumulative complaints from multiple sources had become "quite regular." *Lashley*, 2022 WL 872604, at *3. Gibbs ultimately concluded that Lashley "would have difficulty maintaining the professional relationships necessary to perform as a SMC professor." *Lashley R&R*, 2021 WL 8014689, at *4. When Gibbs informed Lashley that her teaching contract would not be renewed, he explained it was because "she was not a good fit for SMC." *Id.* at *5. For the reasons noted above, SMC produced sufficient evidence of legitimate, nonretaliatory reasons for not renewing Lashley's teaching contract.

12

2.

We next consider SMC's reasons for terminating Lashley's employment. Lashley claims her termination was motivated by retaliatory animus. Here too, as we have recounted, SMC puts forth evidence to show legitimate, nonretaliatory reasons for firing Lashley.

The decision to fire Lashley was made by President Cochran on February 16, 2018. By that point in time, Cochran had received three independent reports of Lashley's inappropriate and threatening behavior. First, Gibbs reported that on the day Lashley was informed her contract was not being renewed, she began to clear out her office and angrily confronted him. Second, a professor overheard Lashley tell a group of students that she felt like "blowing the school up." Third, Lashley told a colleague that "[b]ad stuff happens when people cross me. . . . They turn up dead." *Lashley*, 2022 WL 872604, at *4.

Lashley denies ever making these comments. Her denial, however, does not negate the fact that these reports of unprofessional and dangerous behavior made their way to President Cochran, who naturally believed they revealed that Lashley was potentially violent and a threat to campus safety. Importantly, the burden at this stage of the analysis is "one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000) (internal quotation marks omitted). So it does not suffice for Lashley to simply challenge the veracity of the evidence SMC puts forth. Despite Lashley's protestations, SMC's evidence shows that Cochran believed Lashley was dangerous—Cochran's apparent motivation was not retaliation; it was safety.

13

In sum, SMC advanced legitimate reasons for not renewing Lashley's contract and terminating her employment. SMC therefore carried its burden at this step of the *McDonnell Douglas* framework to "produc[e] evidence that" it acted "for a legitimate, non[retaliatory] reason." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981).

## B.

The burden then shifts back to Lashley to show that SMC's proffered reasons were a pretext for unlawful retaliation. At this final stage, "the *McDonnell Douglas* framework—with its presumptions and burdens—disappears," and the "employee must prove" that the "legitimate reasons offered by the defendant[] were not its true reasons, but were a pretext." *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 726 (4th Cir. 2019) (internal quotation marks omitted). The analysis "has long demanded proof at the pretext stage that retaliation was a but-for cause of a challenged adverse employment action." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015).

Lashley faults the district court at this step for applying an invalid "pretext plus" standard. Opening Br. at 39. We disagree. A "pretext-plus" standard would require "that an employee introduce *new* evidence, separate from her prima facie case, that *not only* undercut the employer's justification *but also* showed a specific and discriminatory [or retaliatory] motive." *Westmoreland*, 924 F.3d at 726–27. That is not required here. Lashley's claims fall short not only because she fails to provide evidence of retaliatory motive, but because she does not offer evidence beyond mere conjecture to undercut SMC's justifications. Lashley's claims therefore fail under the well-established pretext standard for multiple reasons. We examine each below.

14

1.

First, Lashley's claim of pretext is undermined by the fact that the primary decisionmakers at SMC were not aware of Lashley's ADA or Title IX protected activity.

Gibbs was the primary decisionmaker behind not renewing Lashley's contract. Yet Lashley failed to produce any concrete evidence that Gibbs was even aware that Lashley helped students file Title IX complaints. Indeed, Gibbs's decision was not influenced by previous Title IX complaints because Lashley raised Title IX complaints in September and December of 2017, yet in January of 2018, Gibbs extended her a separate contract to teach an additional Spring semester class. The record is also devoid of evidence that Gibbs was aware of Lashley's request for an ADA reasonable accommodation form, which Lashley had in fact requested remain confidential.

Similarly there is no evidence that President Cochran, who made the call to terminate Lashley, knew of Lashley's ADA request or her Title IX complaints when he decided to fire her. To the contrary, the record shows Lashley's ADA and Title IX complaints went to Jenny Dunn, SMC's Human Resources and Title IX Coordinator. *See Lashley*, 2022 WL 872604, at *3 (describing that Lashley's request for ADA accommodation went to Dunn); *Lashley R&R*, 2021 WL 8014689, at *2 (showing that Lashley's Title IX complaints likewise went to Dunn). There is no evidence that Dunn was even consulted in the decisions regarding Lashley's contract or termination. *See Lashley R&R*, 2021 WL 8014689, at *10, *13. Decisionmakers can hardly be accused of harboring a retaliatory animus when they were unaware of the actions that allegedly led to the retaliation. Without evidence on this score, the chain of causation is broken and Lashley

15

cannot show that retaliation was "a but-for cause" of the adverse action. *Foster*, 787 F.3d at 252; *see also Guessous*, 828 F.3d at 217.

Second, any notion of pretext is further dispelled by the fact that SMC's explanations have been consistent throughout. Gibbs did not renew Lashley's contract because she was not a good fit for SMC. Cochran fired Lashley because of her threatening interactions with colleagues. These were the very reasons communicated to Lashley back in February 2018. *See Lashley R&R*, 2021 WL 8014689, at *5–6. The record lacks any sign of deviating from these explanations to make SMC's story seem more plausible. *See EEOC v. Sears Roebuck*, 243 F.3d 846, 852–53 (4th Cir. 2001) (instructing that inconsistent explanations for an adverse employment action are "probative of pretext"). A straight and consistent line of explanation is more persuasive than one which wanders here, there, and yonder.

Third, Lashley has not shown that Cochran did not honestly believe the reports of Lashley's threatening comments. While Lashley denies making any threats, three different sources indicated that she did. We have previously explained that a plaintiff must rebut the fact that the "decisionmaker[] honestly believed" the threats, "regardless of whether [the plaintiff] did in fact issue the threats." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 217 (4th Cir. 2007). If Cochran sincerely believed the threats, then his decision to fire Lashley was not a pretext for retaliation. An honest, nonretaliatory belief cannot by definition be the basis for the imposition of retaliatory liability. Rather than refuting Cochran's sincere belief, the record supports the contention that he found the threats credible. The professor who informed Cochran of Lashley's "evil people" comment

16

testified that he was "genuinely concerned that she might be angry enough to harm someone." *Lashley*, 2022 WL 872604, at *4.

2.

We come then to the main thrust of Lashley's pretext argument, namely that SMC's "good fit" justification is a thinly veiled disguise for retaliation. Lashley insists that "Gibbs's conclusory statement that she was not a 'good fit' for SMC . . . is itself compelling evidence of retaliatory animus." Opening Br. at 32.

This is too broad an assertion. Describing an employee as not a "good fit" is an assessment that employers make all the time. Maybe someone's skills do not match up with the institution's mission. Maybe someone's work ethic falls short of expectations. Maybe someone is just not a good team player. Though there may be circumstances where evidence reveals that "good fit" is a subterfuge for discrimination or retaliation, it is also a perfectly innocuous comment that an organization's collaborative goals would not be furthered, and in fact might be retarded, by a particular employee. Institutional success is often a collective enterprise toward which an employer has entirely reasonable expectations that each employee should contribute.

Any institution, especially a place of higher education whose "core . . . mission" is to foster a certain community and advance a unique pedagogical vision, is well within its rights to want people who can work well with others to achieve those goals. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2064 (2020). To wit, SMC has such a mission. SMC's President explained that a good fit "for us is someone who is able and willing to effectively teach the demographics we teach with great success and academic

17

integrity," who possesses the "[a]bility to be a good colleague with your faculty and staff," as well as the ability to exhibit the "appropriate behavior with students and a level of professionalism with the appropriate boundaries between students and faculty." J.A. 1041.

This decidedly does not mean that every employee hold the same views or teach the same way or refrain from the kind of individual expression and opinions that make for genuine mutual respect. The record here indicates SMC was seeking cooperation, not conformity. Respect for individuality within a healthy institutional whole was a valid aspiration for the college to adopt.

Lashley attempts to refute SMC's "good fit" reasoning by portraying herself as the embodiment of the ideal whistleblower, intent on bringing to light misbehavior by students and employees. *See* Oral Arg. at 0:41. Whistleblowers certainly play a salutary role in our society. They can point out deficiencies and dishonesty within an organization that would otherwise go unnoticed and unrevealed. Their status is often protected under law, and for good reason. *See, e.g.*, 5 U.S.C. § 2302(b)(8)(A); 29 U.S.C. § 218c; 15 U.S.C. § 78u-6(a)(6); *Lawson v. FMR LLC*, 571 U.S. 429, 436 (2014) (referencing "some 20 United States Code incorporated whistleblower protection provisions"). Plaintiff, however, cannot claim that mantle. We have accorded her the benefit of the reasonable inferences due her under the summary judgment standard. But at the end of the day, the record reveals unrelieved personality conflicts, unprofessional favoritisms, unwarranted threats, and contempt for what the defendant institution was attempting to accomplish. We cannot see how addressing those problems was a pretext for retaliatory or discriminatory animus.

18

III.

Lashley finally brings several claims under the ADA.

A.

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees." 42 U.S.C. § 12112(a). Discrimination can include failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A).

We thus address Lashley's claim that SMC discriminated against her by failing to accommodate her disability. To prevail on a failure-to-accommodate claim, "a plaintiff must show (i) she was disabled, (ii) the employer had notice of her disability, (iii) she could perform the essential functions of her position with a reasonable accommodation, and (iv) the employer refused to make such accommodation." *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 378 (4th Cir. 2022).[1]

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). The district court found that Lashley's gastrointestinal issues could arguably qualify as a disability as defined by the ADA. Lashley insists that she also suffered from PTSD and

---

[1] Lashley also claims she suffered an adverse employment action when SMC rescinded its promise to pay her salary and benefits through the end of her contract year. The record shows, however, that SMC paid the full salary and benefits owed to her. *See* J.A. 600.

19

Lupus. The record is devoid of evidence, however, that PTSD and Lupus "substantially limit[ed] one or more" of Lashley's "major life activities." *Id.* Though she claims she informed Gibbs of these ailments in a meeting, no evidence indicates that she informed Gibbs or anyone else at SMC how these medical issues were significantly impairing her life activities. Lashley's claims of additional disabilities beyond gastrointestinal issues therefore do not survive the first step of the analysis.

Regardless of the district court's conclusion on the first prong of Lashley's failure-to-accommodate claim, her argument falters on the subsequent prongs. The ADA's implementing regulations instruct that to "determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation," which "should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 16 C.F.R. § 1630.2(o)(3).

Any failure here to engage in such an interactive process was not caused by SMC. Lashley contacted HR personnel to request an accommodation form and informed them that she had been diagnosed with Crohn's Disease, which was causing her gastrointestinal issues. From that point, however, the record reveals that Lashley failed to engage in the interactive process in several ways. She did not tell SMC how the diagnosis limited her ability to work. She neglected to inform SMC of the accommodation she would need to perform the essential duties of her job. *See Cowgill*, 41 F.4th at 378. She did not request

20

any measures that would mitigate the effects of her Crohn's Disease. Worse still, Lashley never returned the accommodation form. *Lashley*, 2022 WL 872604, at *3.

We cannot fault SMC for failing to accommodate plaintiff. Due to Lashley's communication breakdown, SMC was left guessing what an accommodation for Lashley might entail. "Before an employer's duty to provide reasonable accommodations—or even to participate in the 'interactive process'—is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 347 (4th Cir. 2013) (quoting *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011)). Lashley cannot show that SMC refused to make an accommodation because she cannot show that she ever properly requested one. Her failure-to-accommodate claim fails for this reason.

### B.

Lashley's last claim is that SMC violated the ADA by asking her unlawful health questions. The ADA provides that an employer "shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). Lashley argues that Gibbs violated that ADA when he allegedly told Lashley—in an "angry" and "threatening" tone—"tell me about your health issues." Opening Br. at 45–46. Gibbs denies ever demanding that Lashley tell him about her medical issues. J.A. 912.

Even viewing the evidence in the light most favorable to Lashley, her bare testimony cannot form a successful claim for unlawful health inquiry. *See Webster*, 38 F.4th at 410.

21

To begin with, "[w]hether a medical inquiry is job-related and consistent with business necessity is an objective inquiry." *Coffey v. Norfolk S. Ry. Co.*, 23 F.4th 332, 339 (4th Cir. 2022) (internal quotation marks omitted). So how Lashley subjectively perceived Gibbs's tone is immaterial under that standard.

Furthermore, we have noted that the objective "standard is met if the employer reasonably believes that an employee's medical condition impairs [her] ability to perform the essential functions of the job" and the inquiry "is no broader or more intrusive than necessary." *Id.* (internal quotation marks omitted). Even assuming Gibbs had Lashley tell him about her health, the inquiry satisfies this standard.

Lashley had told faculty, staff, and students at SMC about her various health issues, usually in the context of missing or rescheduling classes. *See Lashley R&R*, 2021 WL 8014689, at *14 (cataloguing nearly a dozen examples of Lashley telling others about a variety of ailments). In particular, Lashley told a colleague that she had "been sick since she arrived and was going to see a pulmonary doctor to have her lungs swabbed" due to the "unhealthy conditions" in her office building, referring to the alleged mold in the ceiling. J.A. 585. These complaints came to Gibbs's attention.[2]

Given these circumstances, Gibbs acted reasonably in meeting with Lashley to discuss her health issues. When a teacher tells others at the school that she is having medical problems, causing her to cancel classes, it is only reasonable that one of her

---

[2] We note that these generalized health complaints, as opposed to a more formal request for an ADA accommodation, do not rise to the level of ADA-protected activity, and indeed Lashley does not pursue them as such. *See* Opening Br. at 26.

superiors inquires about them. *See Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 155 (4th Cir. 2012) (holding summary judgment proper where health issues disclosed to others).

Moreover, to determine whether Lashley's claimed issues threatened her ability to perform the essential functions of the job, *Coffey*, 23 F.4th at 339, Gibbs needed to know how he could accommodate her so that she could continue working. Lashley had complained of unhealthy conditions in the building that housed her office and classes. Gibbs therefore had to assess whether these conditions would obstruct her ability to teach classes and hold meetings in that building. Gibbs offered Lashley an alternative office in another building to address her concerns about mold, but Lashley rejected this option.

Last, Lashley fails to show that this inquiry was "broader or more intrusive than necessary." *Id.* The sole evidence put forth is her testimony that Gibbs demanded she tell him about her health issues in an angry tone. There is no evidence of invasive follow-up questions or demands for confidential medical information. Lashley's assertions are not enough to conclude that the query was unlawfully obtrusive, especially when viewed against the objective evidence that Gibbs needed some information in order to alleviate Lashley's concerns. There is no indication that Gibbs crossed the line drawn by the ADA.

IV.

For the foregoing reasons, the judgment of the district court is affirmed.[3]

*AFFIRMED*

---

[3] Because we affirm the district court's grant of summary judgment, we reject Lashley's contention that the court abused its discretion in failing to award her sanctions.