**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 24-1207**

———————————

SHARISE PARKER,

        Plaintiff – Appellant,

    v.

CHILDREN'S NATIONAL MEDICAL CENTER, INC.,

        Defendant – Appellee.

------------------------------

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

        Amicus Supporting Appellant.

———————————

Appeal from the United States District Court for the District of Maryland, at Baltimore. Julie R. Rubin, District Judge. (1:20-cv-03523-JRR)

———————————

Argued: March 20, 2025                         Decided: May 30, 2025

———————————

Before NIEMEYER, AGEE, and THACKER, Circuit Judges.

———————————

Affirmed by unpublished per curiam opinion.

———————————

**ARGUED:** David Manuel Baña, LAW OFFICE OF DAVID BAÑA, ESQ., Baltimore, Maryland, for Appellant. Jeffrey Thomas Johnson, NELSON MULLINS RILEY &

SCARBOROUGH, LLP, Baltimore, Maryland, for Appellee. James M. Tucker, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae. **ON BRIEF:** Tonya Baña, TONYA BAÑA LLC, Baltimore, Maryland, for Appellant. Kraig B. Long, Mary C. Biscoe-Hall, NELSON MULLINS RILEY & SCARBOROUGH, LLP, Baltimore, Maryland, for Appellee. Karla Gilbride, General Counsel, Jennifer S. Goldstein, Associate General Counsel, Elizabeth E. Theran, Assistant General Counsel, Office of General Counsel, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Sharise Parker appeals from the district court's grant of summary judgment to her former employer, Children's National Medical Center, Inc., on her claims alleging pregnancy discrimination, retaliation, and failure to accommodate under federal law. For the reasons set forth below, we affirm the district court's judgment.

I.

In September 2018, Parker began work as a training specialist for Children's National in Silver Spring, Maryland. Her immediate supervisor was Itina Viaud. Per the Introductory Period Performance Evaluation Policy, Children's National hired Parker subject to a six-month introductory period during which her performance would be under review before determining whether to hire her as a regular employee. During this probationary period, Parker was subject to certain limitations that regular employees were not and she was exempted from certain rights vested in regular employees.

As a training specialist, Parker coordinated and led orientation and training programs for new and existing employees. Many of those programs culminated in competency testing, which she was to facilitate. In addition, she prepared regular newsletters to distribute to Children's National employees and compiled data about employee assessments into reports.

The record is replete with emails documenting Parker and Viaud's communications throughout her employment, which spanned September 2018 to February 2019. In some, Viaud is congratulatory and enthusiastic about Parker's performance. In many others,

3

Viaud expressed frustration with Parker missing deadlines, requiring multiple opportunities to fix work she'd already been told to correct, and otherwise not communicating or performing in line with expectations.

In the second month of her employment, Parker learned that she was pregnant, and she informed Viaud shortly before Thanksgiving. On December 2, Parker experienced vaginal bleeding and, fearing a first-trimester miscarriage, sought emergency care. The bleeding turned out to be a burst uterine fibroid. Parker was told to maintain bed rest through December 5 and to seek follow-up care from her regular physician. When Parker returned home from the hospital on December 3 to begin her bed rest, she nonetheless participated in a work call and performed a few hours of work. But Viaud soon told her not to work further during this period, noting that she was supposed to be on bed rest. Parker returned to work without restrictions on December 6.

In mid-January, Parker's doctor advised her that she had additional uterine fibroids that were at risk of bursting during the course of her pregnancy. This condition added a second basis for Parker's pregnancy being deemed high risk (the first being her age). The doctor advised Parker to work no more than eight hours a day for the remainder of her pregnancy and provided her with a note to share with her employer to that effect.

It's disputed whether Parker informed Viaud of this eight-hour workday or provided any explanation about why she had been given this restriction, but for purposes of assessing the appropriateness of summary judgment in Children's National's favor, we accept as true Parker's recollection that she did so. Parker stated during her deposition that by the end of January, her schedule was "becoming too much," so sometime between January 22 and

4

January 28, she telephoned Viaud to relay that her doctor "gave me a note" saying that "I can only work the eight hours" J.A. 453. According to Parker, Viaud responded, "you're a salaried employee" and "expected to work more than eight hours" when necessary to complete work on time. J.A. 453; *see also* J.A. 364 ("In response, Viaud said that it didn't matter if Parker was pregnant because she was still a salaried employee and her pregnancy was 'no excuse.'"). At her deposition, Viaud did not recall this conversation.

On January 29, Viaud emailed Senior Human Resources Business Partner Efstratios Gonithellis to follow up on a prior telephone conversation regarding terminating Parker's employment "before her probation ends in March." J.A. 546. Viaud noted that Gonithellis "wanted to check to make sure [that] there were no loop holes due to the fact that she is pregnant," and Viaud "wanted to follow up" "as to protocol to initiate and complete this process." J.A. 546. Gonithellis confirmed, "there are no issues regarding a potential termination stemming from the fact that she is pregnant, provided that you as manager have documented and counselled regarding the performance concerns appropriately." J.A. 545. Gonithellis provided Viaud the paperwork to proceed with Parker's termination and Viaud submitted the formal Recommendation for Termination form, which listed March 15 (the end of Parker's probationary period) as the proposed date for terminating Parker's employment. Further, the form provided an overview of numerous examples of how Parker, in Viaud's estimation, failed to complete adequate work on time, exercise good judgment in managing job demands, or adequately improve her performance despite multiple interventions. In response, Gonithellis asked Viaud why, given Parker's failure to meet performance expectations, she would keep Parker on staff for the remaining six weeks

5

of her introductory period. Viaud replied that Parker "posed no immediate and urgent risk," so she had originally requested the March date, but that she was amenable to terminating Parker's employment earlier. J.A. 543. In early February, Gonithellis and another individual at Children's National completed their assessment of the documentation Viaud provided and approved her recommendation to terminate Parker's employment, effective March 1.

Unaware of those events, on February 22, Parker submitted a formal request for a pregnancy-related workplace accommodation, including her doctor's note as part of her paperwork. Children's National's third-party administrator handled the request. It informed her that because she was in an introductory period of employment, she was not eligible for certain benefits, but that she was eligible to apply for an accommodation under the Americans with Disabilities Act (ADA). The third-party administrator told her to submit a medical assessment to complete her request by March 15. Viaud learned of Parker's formal accommodation request the same day she made it.

At the end of the workday on February 28, Viaud informed Parker that her employment was being terminated, effective immediately. Parker's termination letter stated that her "work performance is not at a level consistent with the requirements of [her] job description." J.A. 666.

Parker later filed a complaint, subsequently amended, against Children's National in the U.S. District Court for the District of Maryland asserting the following claims: (1) sex discrimination, in violation of Title VII, as amended by the Pregnancy Discrimination Act (PDA); (2) pregnancy-related disability retaliation, in violation of the ADA; (3) failure

6

to accommodate under the ADA, as amended by the ADA Amendments Act of 2008 (ADAAA); and (4) corresponding state law claims. Because the analysis of the state law claims overlaps in all relevant respects for this appeal with the federal claims, we will not address them separately.[1]

Following discovery, Children's National moved for summary judgment, which the district court granted. *Parker v. Children's Nat'l Med. Center, Inc.*, No. 1:20-cv-03523-JRR, 2024 WL 943438, at *1 (D. Md. March 4, 2024). In so doing, the court engaged in an extensive discussion of each claim and the record before reaching its conclusion, often providing more than one ground for denying a single claim. *See id.* at *5–31.

Parker noted a timely appeal, and we have jurisdiction under 28 U.S.C. § 1291.

II.

The Court reviews de novo the district court's grant of summary judgment. *Higgins v. E.I. DuPont de Nemours & Co.*, 863 F.2d 1162, 1167 (4th Cir. 1988). Summary judgment is appropriate only if there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In undertaking this review, the Court is to view the facts in the light most favorable to the non-moving party, here, Parker, and draw all reasonable inferences in her favor. *W.C. Eng., Inc. v. Rummel, Klepper*

---

[1] Parker also brought a retaliation claim under Title VII, but the district court granted Children's National's motion to dismiss that claim under Federal Rule of Civil Procedure 12(b)(6). *See Parker v. Children's Nat'l Med. Ctr., Inc.*, No. ELH-20-cv-3523, 2021 WL 5840949, at *21–23 (D. Md. Dec. 9, 2021). Parker did not challenge that decision, so it is not before us on appeal.

7

*& Kahl, LLP*, 934 F.3d 398, 402–03 (4th Cir. 2019) (quoting *Certain Underwriters at Lloyd's, London v. Cohen*, 785 F.3d 886, 889 (4th Cir. 2015)).

A.

Parker elected to prove her discrimination and retaliation claims by using the *McDonnell Douglas*[2] burden-shifting framework, which unfolds in three steps.

First, a plaintiff must put forth her prima facie case. In a discrimination case, that means she must show that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) at the time of the adverse action, she was performing at a level that met her employer's legitimate job expectations; and (4) "ordinarily," that her position was filled by a similarly qualified applicant outside the protected class, though in other "limited situations," that she otherwise came forward with proof "eliminat[ing] an inference of non-discrimination." *Miles v. Dell, Inc.*, 429 F.3d 480, 485, 487–89 (4th Cir. 2005). In a retaliation case, a prima facie case requires showing: (1) she engaged in protected activity, (2) she suffered an adverse employment action; and (3) causation. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015).

Second, the burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for its challenged action. *Hill v. Lockheed Martin Logistics Mgmt. Inc.*, 54 F.3d 277, 285 (4th Cir. 2004) (en banc), *overruled in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) (Title VII discrimination).

---

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

8

Third, the burden of production "shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." *Id.* (internal quotation marks and citation omitted). Critically, however, the plaintiff always bears the "ultimate burden of establishing that the defendant discriminated against her 'because of' her [protected status or activity]." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 297 (4th Cir. 1998). It is for that reason that the final stage of the *McDonnell Douglas* framework has also been described as the point at which its "presumptions and burdens . . . disappear, and the sole remaining issue is discrimination *vel non*." *Hill*, 354 F.3d at 285 (cleaned up); *accord Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004) ("Under the *McDonnell Douglas* framework, in order to survive a motion for summary judgment, the plaintiff must have developed some evidence on which a juror could reasonably base a finding that discrimination [or retaliation] motivated the challenged employment action.").

In granting summary judgment to Children's National, the district court made various adverse rulings related to aspects of Parker's prima facie Title VII/PDA discrimination and ADA/ADAAA retaliation claims. Parker challenges those decisions on a number of grounds. Having reviewed the record, though, we determine that we need address only one of those arguments because, even assuming that Parker successfully carried her burden of showing a prima facie claim, she did not come forward with evidence suggesting that Children's National's legitimate, non-discriminatory and non-retaliatory grounds for terminating her employment were pretextual. As such, her claims cannot survive summary judgment.

9

In arguing otherwise, Parker lodges two attacks on the district court's pretext analysis. First, she asserts the district court improperly applied a pretext-plus standard that the Supreme Court has disavowed. Second, she contends the district court improperly viewed the evidence in the light most favorable to Children's National and ignored certain other evidence suggestive of pretext. Parker maintains that the record, when viewed under the proper standards, is sufficient for a factfinder to conclude that Children's National's proffered reasons for terminating her employment were pretext for discrimination and retaliation.

We disagree with Parker. The district court did not hold Parker to a "pretext-plus" standard and it applied the proper legal standard in its pretext analysis. This Court and others had at one time adhered to a "pretext-plus" standard that the Supreme Court "abrogated" in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000). Under the former pretext-plus test, "an employee could *never* demonstrate pretext . . . solely by undermining an employer's proffered explanation. Instead, [it required] that an employee introduce *new* evidence, separate from her prima facie case, that *not only* undercut the employer's justification *but also* showed a specific and discriminatory motive." *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 727 (4th Cir. 2019) (internal citations omitted) (first emphasis added). But in *Reeves*, the Supreme Court rejected the pretext-plus approach to the extent it precluded an employee from *ever* relying on falsity as a basis for establishing pretext. In doing so, it recognized that "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination," and that proof of falsity may well permit a

10

factfinder to infer a discriminatory purpose or leave discrimination as "the most likely alternative explanation." *Id.* at 147. The Court observed that, for these reasons, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148. Yet the Supreme Court was quick to note that "[t]his is not to say that such a showing [i.e., proof of falsity] will *always* be adequate to sustain a jury's finding of liability," as "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id.*

Since *Reeves*, we have described the final step of *McDonnell Douglas* at the summary judgment stage to shift the burden back to the plaintiff "to produce evidence sufficient to create a material issue of fact as to whether [the employer's] alleged reason for firing her was not its true reason, but rather a pretext for discrimination." *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 257 (4th Cir. 2025). We observed that, under *Reeves*, a plaintiff can establish pretext in one of two ways: (1) by "offering evidence that the employer's justification is unworthy of credence," *or* (2) by "adducing other forms of circumstantial evidence sufficiently probative of discrimination." *Id.* (cleaned up).

Applying these principles here, we find that the district court did not hold Parker to a pretext-plus standard and that it properly found that Parker's evidence did not satisfy her burden of production to survive summary judgment. As for how it approached the pretext inquiry, the district court discussed *Reeves* and cases applying *Reeves* at length, distilling from them that pretext could be demonstrated by showing that the employer's legitimate

reason was either "unworthy of credence" or "false." *See Parker*, 2024 WL 943438, at *28–31. It then correctly identified as "[t]he precise issue" before it as "whether, based on the record before the court, there is evidence from which a factfinder could conclude that [Children's National's] asserted justification is false, and that the alleged form of discrimination was the real reason." *Id.* at *29 (cleaned up); *see, e.g., Foster*, 787 F.3d at 252 (observing, in the context of retaliation, that to carry her burden on pretext, "a plaintiff must establish both that the employer's reason was false and that retaliation was the real reason for the challenged conduct" (cleaned up)). That is nearly identical to how *Reeves* described the pretext inquiry: "[I]t is not enough to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." 530 U.S. at 147 (cleaned up); *accord Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 176 (4th Cir. 2023) (rejecting plaintiff's argument that the district court improperly held her to a pretext-plus standard when it required her to prove "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext" because doing so did *not* impose any additional—i.e., "plus"—burden (cleaned up)).

To no small extent, Parker's arguments overlook that it remained her burden throughout to come forward with proof that Children's National discriminated or retaliated against her when it terminated her employment, even if the precise framework in which she did so was the pretext stage of the *McDonnell Douglas* inquiry. The district court did not require her to come forward with *more* evidence of discrimination, but rather appropriately looked at the totality of the record for proof of "discrimination *vel non*." *Hill*, 54 F.3d at 285 (cleaned up); *accord Reeves*, 530 U.S. at 147–48.

12

Having concluded that the district court applied the proper pretext analysis to Parker's claim, we turn to the substance of its analysis. There, too, we discern no error. The district court first observed that Children's National had produced "strong evidence that [Parker] was terminated due to her poor performance." *Parker*, 2024 WL 943438, at \*30. For example, the court recounted at some length from Viaud's deposition testimony describing the performance issues that ultimately led her to recommend Parker's termination of employment. Among other things, Viaud cited Parker's failure to meet deadlines, submission of incomplete and inadequate work "that required multiple redos," and general inattention to details, all of which led Viaud to have to put in significant time correcting and following up with Parker. *Id.* at \*27–28. The totality of the record led the district court to conclude that Parker offered scant evidence or argument to suggest that anything but her performance led to the termination of her employment. *See id.* at \*30–31.

Parker resists this conclusion, pointing to several items in the record she contends satisfy her burden of showing that Children's National's stated reasons were not its true reasons. Having reviewed the record, we disagree that any of the materials on which Parker relies, individually or collectively, undermine the district court's conclusion. As we have said time and again, a plaintiff may create a question of fact as to pretext by coming forward with circumstantial evidence such as "that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact." *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 652 (4th Cir. 2021) (cleaned up). But a plaintiff does not create a question of fact precluding summary judgment "by focusing on minor discrepancies that do not cast doubt on [an employer's] explanation's validity, or

13

by raising points that are wholly irrelevant to" this determination. *Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006). Notwithstanding this general observation, a handful of Parker's arguments warrant further explanation.

Parker relies on a purported inconsistency in terminating her employment for poor performance based on Viaud's initial proposal that Parker be retained through the end of her introductory period. But an email exchange regarding the *timing* of Parker's termination of employment does not suggest any contradiction in the record about the *reason* for that decision. Viaud consistently explained to Gonithellis that she wished to terminate Parker's employment for failure to meet performance expectations. Moreover, her first email following up on a telephone call between the two referred to terminating Parker's employment "*before* her probation ends in March," J.A. 546 (emphasis added), which is entirely consistent with what unfolded. Although Viaud later filled out paperwork suggesting a termination date of March 15, when questioned about such a delayed date, she explained that she had chosen that date because it was the end of Parker's probationary period and Parker "posed no immediate and urgent risk to the organization." J.A. 543. Even viewed in the light most favorable to Parker, the email exchange does not call into question *why* Viaud approached Gonithellis about terminating Parker's employment or raise a reasonable inference of pretext.

Parker also points to Viaud's use of the phrase "loop holes due to the fact that [Parker] is pregnant" when asking Gonithellis for "final confirmation that [she could] proceed with termination before [Parker's] probation ends in March." J.A. 546; *see* J.A. 546 ("You wanted to check to make sure if there were no loop holes due to the fact that

14

she is pregnant."). Describing this term as "derogatory" when applied to "federal workplace rights," Parker maintains that a "jury could interpret it as [Children's National] attempting to find a way around these rights to terminate [her] employment due to her pregnancy." Opening Br. 58. Even viewed in the light most favorable to Parker, this exchange does not support that interpretation. Gonithellis stated during his deposition that he interpreted Viaud's use of this phrase simply to inquire if there were "any concerns due to the fact that" Parker was pregnant, while acknowledging that "there could have been a better choice of words." J.A. 646–47. And he responded to Viaud's email consistent with that view, by confirming that "there are no issues regarding a potential termination stemming from the fact that [Parker] is pregnant, provided that you as manager have documented and counselled regarding the performance concerns appropriately." J.A. 545. That is an accurate statement of the law, which forbids discrimination on account of pregnancy, but does not preclude a pregnant individual from having their employment terminated for any legitimate, non-discriminatory reason.

Next, Parker contends that she has adequately suggested pretext because Children's National failed to follow its Corrective Action Policy before terminating her employment. That policy "established general guidelines . . . for managers to use when counseling and disciplining employees," J.A. 671, which included steps providing notice and the opportunity to take corrective action before termination of employment. But the undisputed record evidence shows that the Corrective Action Policy did not apply during an employee's introductory period, so it did not apply to Parker. Any alleged deviation from

15

it would thus be irrelevant to the pretext inquiry. *See Hux*, 451 F.3d at 315 (observing that a plaintiff cannot demonstrate pretext "by raising points that are wholly irrelevant to it").[3]

In sum, the record does not paint the picture Parker sees. Instead, as the district court concluded, the record shows that weeks before Parker announced her pregnancy and continuing through the decision to terminate her employment, Viaud repeatedly had to clarify expectations, provide Parker multiple opportunities to complete work as already instructed, and counsel her about juggling deadlines and providing timely and accurate work product. That need for additional oversight led to multiple interventions, including "weekly debriefs" to track Parker's performance and deadline compliance in an attempt to bring her employment up to expectations. J.A. 582. And Parker has not shown that this legitimate, non-discriminatory ground for terminating her employment was pretext for pregnancy discrimination or retaliation. Accordingly, we affirm the district court's grant of summary judgment on Parker's Title VII/PDA discrimination claim and her ADA retaliation claim.

---

[3] Of final note, Parker asserts that a factfinder could determine Children's National's reasons were pretextual based on the temporal proximity between her request for an accommodation to work only eight hours a day and Viaud's decision to contact Gonithellis about terminating her employment. But we have previously noted that temporal proximity alone "generally cannot defeat summary judgment once an employer has offered a convincing, nonretaliatory explanation" for its challenged conduct. *S.B. ex rel. A.L. v. Bd. Educ. of Harford Cnty.*, 819 F.3d 69, 79 (4th Cir. 2016); *see also Wannamaker-Amos*, 126 F.4th at 260 (holding that proximity, in combination with other factors, can be circumstantial evidence of pretext).

16

B.

Parker also asserted an ADA failure-to-accommodate claim, which does not have pretext as part of its analysis, and so is not resolved by the above discussion. *See Perdue v. Sanofi U.S., LLC*, 999 F.3d 954, 959 n.2 (4th Cir. 2021). "To show an employer's failure to accommodate, the plaintiff must prove: (1) that she had a disability within the statutory meaning; (2) that the employer knew of her disability; (3) that a reasonable accommodation would permit her to perform the essential functions of the position; and (4) that the employer refused to make the accommodation." *Id.* at 959.

The district court relied on three grounds to deny this claim. It addressed principally why it concluded that Parker was not an individual with a disability, as that term is defined by the ADA and ADAAA. It also observed:

> Even were the court to conclude that [Parker] was disabled within the meaning of the ADA, [she] fail[ed] to provide evidence that 'with reasonable accommodation [s]he could perform the essential functions of the position.' Additionally, [Children's National] argues that [Parker] cannot establish a prima facie case of failure to accommodate because [it] in fact did all that it was legally obligated to do with respect to [Parker's] request for accommodations. The court agrees.

*Parker*, 2024 WL 943438, at *19 n.9 (internal citations omitted).

Parker's brief challenges only the first of these three grounds the district court relied on to reject her claim. She argues that she came forward with evidence of a disability as that term is defined by the ADA, and as it has been modified by the ADAAA, and that the district court failed to properly consider that evidence under the more relaxed definitions of a disability set out under the ADAAA. *See Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 328–29 (4th Cir. 2014) (describing the statutory differences). Even so, Parker raises

17

no arguments relating to the district court's two alternative grounds for granting Children's National judgment on this claim, i.e., that an accommodation would permit her to perform the essential functions of her job or that Children's National refused a valid request for an accommodation. By failing to address these alternate grounds in her opening brief, Parker has abandoned any challenge to them on appeal. *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012) ("A party's failure to raise or discuss an issue in his brief is to be deemed an abandonment of that issue."); *see also Brown v. Nucor Corp.*, 785 F.3d 895, 918 (4th Cir. 2015) ("Failure of a party in its opening brief to challenge an alternate ground for a district court's ruling . . . waives that challenge." (quotation marks and citation omitted)). Parker's failure to challenge the alternate grounds that the district court relied on to grant Children's National summary judgment means that it does not matter whether we agree with her that the district court erred as to the disability element of her claim: she would still not be entitled to vacatur and remand of this claim. Accordingly, we do not address the disability element and we affirm the district court's grant of summary judgment on Parker's failure-to-accommodate claim.

## III.

For the aforementioned reasons, we affirm the judgment of the district court in favor of Children's National.

*AFFIRMED*

18