**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

─────────────

**No. 21-1248**

─────────────

MICHAEL COFFEY, JR.,

      Plaintiff – Appellant,

v.

NORFOLK SOUTHERN RAILWAY CO.,

      Defendant - Appellee.

─────────────

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Arenda L. Wright Allen, District Judge. (2:19-cv-00509-AWA-LRL)

─────────────

Argued: December 9, 2021                      Decided: January 14, 2022

─────────────

Before WILKINSON, MOTZ, and HARRIS, Circuit Judges.

─────────────

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Motz and Judge Harris joined.

─────────────

**ARGUED:** Nicholas Delton Thompson, CASEY JONES LAW, Appleton, Wisconsin, for Appellant. Brett Alexander Spain, WILLCOX & SAVAGE, PC, Norfolk, Virginia, for Appellee. **ON BRIEF:** David A. Kushner, Bethany J. Fogerty, WILLCOX & SAVAGE, PC, Norfolk, Virginia, for Appellee.

─────────────

WILKINSON, Circuit Judge:

Plaintiff Michael Coffey, a locomotive engineer for Norfolk Southern Railway Company, brought this suit under the Americans with Disabilities Act (ADA) to challenge the railroad's right to request certain medical records and discharge him for failure to comply. The district court found that the railroad made a lawful request under the ADA and granted summary judgment to Norfolk Southern. We now affirm.

## I.

### A.

Michael Coffey was employed by Norfolk Southern Railway Company from 1999 to 2017. As a locomotive engineer, he was responsible for operating the train, and he had to perform such tasks as responding to hazards on the railroad tracks to prevent collision or derailment. The position required him to walk across uneven tracks and climb steps to board and deboard the train multiple times per shift. Locomotive engineers are subject to Federal Railroad Administration (FRA) regulations regarding alcohol and drug use.

In 2012, a train that Coffey was operating derailed. Shortly thereafter, a drug test revealed the presence of amphetamines in Coffey's system. Coffey was permitted to continue working, but he was subject to follow-up drug testing for five years. In April 2016, one of these drug tests showed the presence of amphetamines and codeine. Coffey explained that he had prescriptions for both medications: the amphetamines were Adderall, which he took for Attention Deficit/Hyperactivity Disorder (ADHD), and the codeine was Tylenol #3, which he took for a back condition.

2

In response, Norfolk Southern requested that Coffey provide certain records relating to his medication usage within thirty days. The letter stated that Coffey's treating physicians should address, among other things, Coffey's diagnoses, significant symptoms, medication regimen and compliance with that regimen, medication side effects, awareness of other medications prescribed by other doctors, ability to safely perform essential job functions, and recommended work restrictions or accommodations. According to Coffey, he asked his doctors to send the records and he believed they followed through. Norfolk Southern denies having received any records within the thirty-day time frame.

Six weeks later, in June 2016, Coffey ruptured his Achilles tendon and took medical leave from Norfolk Southern. Norfolk Southern requested that when Coffey was ready to return to work, he provide medical information about his injury so that it could determine his fitness for service as an engineer. Coffey remained on medical leave from Norfolk Southern for approximately ten months, and in April 2017 his primary care physician cleared him to return to work. At that point, Norfolk Southern sent Coffey a follow-up letter seeking all the records it had previously requested regarding both his medication use and his injury. Coffey says that he repeatedly asked his doctors to provide the requested information to Norfolk Southern. Norfolk Southern repeatedly denied having received the records, and it sent two more letters demanding compliance within certain time frames. Coffey says that this became a recurring pattern where Norfolk Southern would demand records, Coffey would ask his doctor to send them, and Norfolk Southern would inform him that it had not received anything.

In June and July of 2017, Norfolk Southern eventually received certain records from Coffey. Those submissions included a two-sentence note from Coffey's treating physician clearing him to work without restrictions after the injury; the results from a functional capacity evaluation completed some months prior; a one-page note from one of Coffey's doctors verifying that he had a Tylenol #3 prescription; and a one-page note from another of Coffey's doctors verifying that he had an Adderall prescription. However, Norfolk Southern was unsatisfied with the records it received, stating that they failed to include specifically requested information such as medication side effects or the physicians' knowledge of other prescriptions. It therefore notified Coffey that he would be subject to a disciplinary hearing to be held on September 7, 2017. For that hearing, Coffey submitted approximately four hundred pages of medical records. Upon determining that the records produced still did not address much of the required information, Norfolk Southern terminated Coffey's employment.

B.

Coffey appealed his termination to the Public Law Board, a federal arbitration tribunal. The Board found that Norfolk Southern had cause to terminate Coffey, but that he should be reinstated on the condition that he provide the missing records within thirty days. In response, Coffey resubmitted the same records as before, and Norfolk Southern did not reinstate him. Coffey then filed a complaint with the Equal Employment Opportunity Commission (EEOC), which determined that there was reasonable cause to believe that Norfolk Southern's demands had violated the ADA.

4

Coffey subsequently filed suit against Norfolk Southern in federal court under the ADA. He alleged that Norfolk Southern violated 42 U.S.C. § 12112(a) by discriminating against him on the basis of disability and § 12112(d)(4)(A) by making improper medical requests and then terminating him for failure to comply. During discovery, Coffey offered the expert testimony of Dr. Kevin Trangle, who testified that Coffey's medications would not impair his functioning as a locomotive engineer and that Norfolk Southern's records requests were overbroad.

Norfolk Southern moved for summary judgment after discovery. The district court granted that motion, finding no genuine dispute of material fact as to either improper medical inquiries under § 12112(d)(4)(A) or discrimination under § 12112(a). As to the improper medical inquiry issue, the district court concluded that Norfolk Southern's records requests were permissible under the ADA because it had an objectively reasonable basis to believe that Coffey could not properly carry out his duties and that he posed a safety risk. *Coffey v. Norfolk S. Ry. Co.*, No. 2:19CV509, 2021 WL 879121, at *4, 7 (E.D. Va. Feb. 5, 2021). It also noted that the requests were consistent with business necessity because Norfolk Southern was required by federal safety regulations to inquire into employees' use of controlled substances. *Id.* at *5–6. As to the discrimination claim, the district court applied the *McDonnell Douglas* burden-shifting framework. It found that Coffey failed to make out a *prima facie* case because he did not show that he was disabled, *id.* at *8–9, nor did he provide evidence that Norfolk Southern's legitimate, non-

5

discriminatory reasons for terminating him were pretextual, *id.* at *12. Coffey now appeals the district court's determination that the medical inquiries were proper under the ADA.[1]

We review awards of summary judgment *de novo* and apply the same legal standards as the district court. *Nguyen v. CNA Corp.*, 44 F.3d 234, 236–37 (4th Cir. 1995). Summary judgment should be granted if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. We draw all reasonable inferences and view the evidence in the light most favorable to Coffey. *Porter v. U.S. Alumoweld Co.*, 125 F.3d 243, 245 (4th Cir. 1997).

II.

When railroads emerged in this country nearly two hundred years ago, they brought with them great promise—but also real hazards. "[S]ince the beginning of railroad transportation," courts have recognized that railroads are "fraught with danger to the

---

[1] Norfolk Southern appears to construe Coffey's medical inquiry claim as part and parcel of his discrimination claim, and it would have us affirm the district court on the grounds that Coffey failed to make out a *prima facie* case of disability discrimination or show pretext under the *McDonnell Douglas* framework. But these questions are not relevant to the improper medical inquiry claim before us. Other circuits to address this issue have found that improper medical inquiry claims under the ADA § 12112(d)(4)(A) stand apart from general claims of discrimination under § 12112(a) and do not require the plaintiff to show he is disabled. *See, e.g.*, *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1310 (11th Cir. 2013) (collecting cases); *cf. EEOC v. McLeod Health, Inc.*, 914 F.3d 876, 880–81 (4th Cir. 2019) (analyzing these two claims separately). It would "make[] little sense to require an employee to demonstrate that he has a disability to prevent his employer from inquiring as to whether or not he has a disability." *Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1229 (10th Cir. 1997) (citation omitted).

To the extent that Coffey intended to appeal the dismissal of a separate discrimination claim, we likewise affirm the district court for the reasons given. Norfolk Southern has satisfied its burden of showing that it terminated Coffey for public safety reasons, not because of any perceived disability. Coffey has not shown that justification was pretextual.

community." *Atl. Coast Line R. Co. v. Georgia*, 234 U.S. 280, 291 (1914). "Their operation requires the use of instruments and agencies attended with special risks and dangers, the proper management of which involves peculiar knowledge, training, skill, and care." *Smith v. Alabama*, 124 U.S. 465, 481–82 (1888). The costs of a misstep can be serious: loss of human life or property, toxic environmental damage, and the infinite litigation that follows in their wake. It is no coincidence that the term "train wreck" is used as a shorthand for mishaps of all sorts.

Accordingly, "[t]he safety of the public in person and property demands the use of specific guards and precautions" in railway operations. *Id.* For one, railroad operators are charged with a "very strict responsibility" of preventing damage. *Shoemaker v. Kingsbury*, 79 U.S. (12 Wall.) 369, 377 (1870). The industry is also "regulated pervasively to ensure safety" by both the federal and state governments. *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 627 (1989); *see also Atl. Coast Line R. Co.*, 234 U.S. at 291.

Locomotive engineers in particular are "engaged in safety-sensitive tasks," for they "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Skinner*, 489 U.S. at 620, 628. For this reason, the Supreme Court has upheld against constitutional challenge FRA regulations requiring drug and alcohol testing of certain railroad employees, including engineers, whose impairment has the potential to "cause great human loss." *Id.* In doing so, the Court emphasized the great public interest in ensuring railway safety which underlies the regulations. Trains—already dangerous—"become[] lethal when operated negligently by

7

persons who are under the influence of alcohol or drugs." *Id.* (quoting *Ry. Lab. Executives' Ass'n v. Burnley*, 839 F.2d 575, 593 (9th Cir. 1988) (Alarcon, J., dissenting)).

That vital public safety interest has in no way been diluted by technological advancements in the thirty-plus years since *Skinner*. The record in this case contains no suggestion that sophisticated instrumentation has displaced the elements of good and clear judgment that must inhere in a locomotive engineer. Even today, operating a train is not a perfunctory job. Engineers must be aware of whether there are items or obstructions on the track, such as branches, animals, or, heaven forbid, pedestrians. They have to slow down at certain points in the journey where a stop was not planned or respond to unexpected weather conditions. They have to ensure that all personnel are on board when departing the station. They have to navigate switches and intersections where cars cross the rails. Trains run at all hours of the day and night; any one train shares the tracks and station yards with many others. Technology, both on the train and in the surrounding environment, can be helpful in all these things—but none can remove the human element entirely. The need for sound judgment remains.

Hence, "to prevent accidents and casualties in railroad operations" that might result if operators are impaired in their judgment, 49 C.F.R. § 219.1, the FRA extensively regulates the use of controlled substances by railway employees. Those regulations stipulate that "[n]o regulated employee may use or possess . . . any controlled substance when the employee is on duty and subject to performing regulated service for a railroad," *id.* § 219.101(a)(1), nor may he "report for regulated service, or go or remain on duty in regulated service, while . . . [u]nder the influence of or impaired by any controlled

8

substance," *id.* § 219.101(a)(2), (2)(iii). The regulations allow medications "prescribed or authorized by a medical practitioner," *id.* § 219.103(a), but only if three conditions are met. First, if a physician has made "a good faith judgment, with notice of the employee's assigned duties and on the basis of the available medical history, that use of the substance by the employee at the prescribed or authorized dosage level is consistent with the safe performance of the employee's duties." *Id.* § 219.103(a)(1). Second, if the employee uses the medication "at the dosage prescribed or authorized." *Id.* § 219.103(a)(2). And third, if the employee is being treated by multiple physicians, at least one "has been informed of all medications authorized or prescribed and has determined that use of the medications is consistent with the safe performance of the employee's duties." *Id.* § 219.103(a)(3). Amphetamines and codeine are specifically listed as substances to which the regulations apply. *Id.* § 219.101(b).

These regulations further impose on railroads like Norfolk Southern a duty to "exercise due diligence to assure compliance . . . by each regulated employee." *Id.* § 219.105(b). Therefore, when drug tests revealed the presence of codeine and amphetamines in Coffey's system, Norfolk Southern was under an obligation to make further inquiries to ensure that Coffey's use of them complied with applicable safety regulations. It had to investigate not just whether Coffey had valid prescriptions, but whether he was using the medications as prescribed, whether his physicians thought he could safely perform his duties while on the medications, and whether at least one physician was aware of any other prescriptions and thought all could be used safely together. Norfolk Southern's records requests were specifically aligned with this

9

obligation. For the Adderall, Norfolk Southern sought records addressing Coffey's "diagnosis," "significant symptoms" that may have impaired his ability to work, his "prescribed medication," "any significant, unsafe[] impairing medication side effects," his "ability to safely perform [his] essential job functions," and any "recommended work restrictions and/or accommodations." J.A. 129. For the Tylenol #3, Norfolk Southern sought similar records and also inquired about Coffey's "compliance with [his] medication regimen" and his physician's "awareness of all other medications prescribed by [his] other doctors." *Id.* These requests were required by FRA regulations on amphetamine and codeine use by a locomotive engineer.

## III.

Nevertheless, Coffey claims that Norfolk Southern's records requests violated the ADA. Under the ADA, employers are forbidden from "mak[ing] inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability." 42 U.S.C. § 12112(d)(4)(A). Such inquiries are allowed, however, if "shown to be job-related and consistent with business necessity." *Id.*; *see also id.* § 12112(d)(4)(B) (permitting employers to "make inquiries into the ability of an employee to perform job-related functions").

Norfolk Southern's records requests do implicate this provision, since required disclosure of prescription drugs could "reveal disabilities (or perceived disabilities) to employers." *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 95 (2d Cir. 2003). Therefore, there is no basic dispute that the relevant standard is whether Norfolk Southern's

10

records requests were job-related and consistent with business necessity. The question simply lies in the application of that standard.

While Coffey does not deny that Norfolk Southern was permitted to make *some* inquiry into his medication use, he argues that the *volume* of records requested by Norfolk Southern was not necessary or related to his performance of job functions. In other words, he asserts that Norfolk Southern was prohibited by the ADA from requiring him to submit more records than he did. We are not persuaded, however, because Norfolk Southern's requests were not only job-related but also federally required. Moreover, Coffey did not show that Norfolk Southern was unjustified in requesting more records than those he provided.

A.

Whether a medical inquiry is job-related and consistent with business necessity "is an objective inquiry." *Hannah P. v. Coats*, 916 F.3d 327, 339 (4th Cir. 2019) (citation omitted). The standard is met if the employer reasonably believes that an employee's medical condition impairs his "ability to perform the essential functions of the job" or "the employee poses a direct threat to himself or others." *Id.* (quoting *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014)). A business necessity must be based on more than "mere expediency." *Conroy*, 333 F.3d at 97 (citation omitted). The employer must "show that the asserted 'business necessity' is vital to the business" and that "the request is no broader or more intrusive than necessary." *Id. at* 97–98.

Norfolk Southern's inquiries into Coffey's use of amphetamines and codeine were plainly job-related and consistent with business necessity. Once Coffey's drug tests

11

revealed that he was using codeine and amphetamines, Norfolk Southern had an objective basis to believe that those substances could impact Coffey's ability to operate a train. It is of the utmost importance to a railroad that a locomotive engineer's judgment not be clouded or his response time slowed. The EEOC guidelines recognize as much, noting that "[i]n limited circumstances, . . . certain employers may be able to demonstrate that it is job-related and consistent with business necessity to require employees in positions affecting public safety to report when they are taking medication that may affect their ability to perform essential functions." Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act (ADA), 2000 WL 33407181, at *9 (emphasis omitted). "Administrative interpretations of the ADA by the enforcing agency (here, the EEOC), 'while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Porter*, 125 F.3d at 246 (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986)).

Each of Norfolk Southern's specific inquiries into Coffey's medication usage—which included information about diagnoses, symptoms, side effects, ability to perform his job, compliance with prescription regimen, and possible adverse interaction between the medications—were related to Coffey's job. This information is unquestionably consistent with the necessity of ensuring the safe operation of Norfolk Southern's trains. That the inquiries may have required Coffey to provide ample records does not change this conclusion. While we in no way diminish employees' privacy rights against improper medical inquiries, Norfolk Southern, given its responsibility for public safety, was more

than justified in requesting enough information to permit an informed decision about whether it was safe for its locomotive engineer to operate a train.[2]

Not only were these inquiries related to Coffey's job, but, as explained, they were *required* by federal regulation. And "complying with . . . legally binding federal regulation is, by definition, a business necessity." *Bey v. City of New York*, 999 F.3d 157, 171 (2d Cir. 2021). Federal regulations require the railroad to obtain information that is highly germane to public safety; we cannot then read the ADA to subject railroads to substantial liability when they attempt to obtain that information. After all, "[w]hen Congress enacted the ADA, it recognized that federal safety rules would limit application of the ADA as a matter of law." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 573 (1999). Thus, the ADA does not countermand the railroad's "unconditional obligation to follow the regulations and its consequent right to do so." *Id.* at 570. We are in accord with other circuits in declining to force a choice between the rock of ADA liability and the hard place of regulatory violation. *See, e.g.*, *McNelis v. Pa. Power & Light Co.*, 867 F.3d 411, 416 n.2 (3d Cir. 2017) (refusing to force an employer "to pick between ADA liability on the one hand and administrative penalties on the other"); *Williams v. J.B. Hunt Transp.*, Inc., 826 F.3d 806, 811 (5th Cir. 2016) (declining to make employers "face the dilemma of risking ADA liability or violating the [Department of Transportation]'s command"). As the Second Circuit

---

[2] Given our resolution of the issue regarding Coffey's medications, we see no need to address whether Norfolk Southern's inquiries related to Coffey's Achilles tendon injuries were permissible. The questions that Coffey's medication usage presented about his fitness for the job were sufficient in themselves to justify Norfolk Southern's employment decision.

13

recognized in dealing with a similar ADA provision, "an employer cannot be held liable for failing to offer an accommodation that is expressly prohibited by binding federal law." *Bey*, 999 F.3d at 168.

B.

Coffey counters that he was responsive to the railroad's requests, that he provided voluminous information, and that Norfolk Southern had no basis to believe that it needed more. These arguments, however, do not allow his ADA claim to survive summary judgment.

First, Coffey argues that he repeatedly asked his doctors to send his medical documents to Norfolk Southern in an attempt to comply with requirements, and he was under the impression that they did so. But there is no indication in the record that his physicians submitted the relevant information. Coffey conceded this, and he also admits that Norfolk Southern told him the requirements remained unsatisfied. *See, e.g.*, J.A. 1009–11; J.A. 2056 (quoting Coffey's deposition). There is no genuine dispute of fact on this front.

Coffey similarly complains that Norfolk Southern proceeded unreasonably, because it should have assisted him with compliance or spoken directly to his doctor. He might be right as a matter of common courtesy. But this contention does not alter our ADA analysis. Even if there were a better way for Norfolk Southern to get the information it needed, that would not negate its business necessity defense. "The employer need not show that the examination or inquiry is the only way of achieving a business necessity, but the examination or inquiry must be a reasonably effective method of achieving" it. *Conroy*,

14

333 F.3d at 98. Norfolk Southern's request for Coffey to submit his own medical records in response to specific queries was clearly a reasonably effective method of investigating his medication use.

Coffey next points out that, at the very least, Norfolk Southern received records between June and July 2017. He says those records should have been sufficient to dispel any reasonable concern about his ability to perform his job, particularly in light of Norfolk Southern's knowledge that he had been safely doing his job for years while taking the medications. Therefore, he argues, additional medical inquiries beyond what he provided were not objectively justified. This argument is likewise unpersuasive. As explained, Norfolk Southern was required by federal regulation to collect certain information, regardless of Coffey's work history. The one-page letters that Coffey provided from his physicians, which simply confirmed that each medication was prescribed, did not satisfy those regulatory requirements. Neither letter addressed Coffey's compliance with his prescription dosages, whether the medication side effects were consistent with safe performance of his duties, and whether any physician was aware that Coffey was taking other medications that might interact in harmful ways—all information that Norfolk Southern was obligated to investigate once it knew its engineer was taking amphetamines and codeine. *See* 49 C.F.R. § 219.103(a). In fact, Coffey recognized that the letters he submitted did not address these issues, J.A. 1027–29, 1032–33, that he was informed by Norfolk Southern of what information they were missing, J.A. 1036–37, and that there was no evidence that such information was ever provided, J.A. 1038–39, 1051.

15

Dr. Trangle's expert testimony does not require an opposite conclusion. Coffey says that Dr. Trangle established that Norfolk Southern's inquiries were excessive by testifying, for example, that Adderall taken for ADHD was very common and unlikely to adversely impact Coffey's job performance, and that the information Coffey submitted should have been sufficient to satisfy safety concerns or federal requirements. But expert testimony is not sufficient to create an issue of triable fact when a course of action is required by federal regulation. "[A]n employer should not be required to defend its adherence to a binding federal safety regulation" just because an expert testifies that such adherence is not necessary. *Bey*, 999 F.3d at 168. At bottom, Norfolk Southern's inquiries were compelled by binding FRA regulation, and we cannot fault the company for its efforts to comply with federal law.

IV.

In requesting medical records from Coffey, Norfolk Southern was fulfilling its regulatory obligation to investigate his drug usage with due diligence. Were a failure to investigate to cause a train wreck, Norfolk Southern would be told under the unremitting glare of hindsight of all it should have done.

The judgment is affirmed.

*AFFIRMED*