# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 14, 2025

Lyle W. Cayce
Clerk

No. 24-10031

Tracy Turner,

*Plaintiff—Appellant*,

*versus*

BNSF Railway Company,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:23-CV-681

_____

Before Graves, Engelhardt, and Oldham, *Circuit Judges*.
Kurt D. Engelhardt, *Circuit Judge*:

The district court dismissed Tracy Turner's Americans with Disabilities Act (ADA) claim against his employer, BNSF Railway, on the pleadings. Turner appeals the district court's judgment. We AFFIRM.

No. 24-10031

## I.

Tracy Turner is a railway conductor.[1] He was employed by BNSF Railway for fifteen years. Federal law requires conductors to pass certain vision tests to be certified and maintain certification as a conductor. So, throughout his fifteen years of employment, Turner was required by federal law to take vision tests. In 2020, Turner failed two vision tests.[2]

First, Turner was given the Ishihara 14-plate clinical vision test.[3] 49 C.F.R. §§ 240.121(c)(3); 242.117(h)(3); Part 240 Appendix F; and Part 242 Appendix D. Turner does not dispute that he failed this test, nor does he claim to have passed equivalent tests in the past during his tenure with BNSF Railway. The Ishihara test requires individuals to distinguish between colors and Turner was born with a color deficiency that affects his perception of the colors red and green.

If a conductor applicant fails the Ishihara test, he may request administration of a second, different, vision test. 49 C.F.R. §§ 240.101, 240.121, 242.117, Part 240 Appendix F, and Part 242 Appendix D. Every Class I railway, including BNSF, uses a Federal Railway Administration (FRA)-approved "field test" if the applicant fails the first clinical vision test. At Turner's request, BNSF's medical examiner further evaluated Turner

---

[1] The complaint refers to Turner as a "trainman." Both parties in their briefing to this court refer to Turner as a "conductor" which appears to be a more specific position within the category of "trainman." The more specific term, "conductor," is used throughout this opinion.

[2] It is unclear from the record how many previous vision tests Turner was administered or how those tests differed from the ones he failed in 2020.

[3] Turner was not allowed to wear chromatic lenses for the clinical vision test under federal law. 49 C.F.R. §§ 240.121(c)(3); Part 240 Appendix F.

and administered a vision field test.[4] 49 C.F.R. § 240.121(e). Turner failed that test too. Because Turner failed the two vision tests and BNSF's medical examiner did not determine that Turner nevertheless could safely conduct trains, BNSF did not recertify Turner as a conductor. 49 C.F.R. § 240.121.

Turner did not appeal the denial of his conductor recertification using the FRA's administrative review process. *See* 49 U.S.C. § 20135(b)(1); 49 C.F.R. §§ 240.401(a), 242.501–.511. This process provides three levels of review at which the FRA could determine that the field test did not comply with federal law or that the medical examiner needed to recertify Turner. *Id.*

Rather than pursue the FRA's administrative process, Turner filed a disability-discrimination charge with the Equal Employment Opportunity Commission (EEOC). *See* 42 U.S.C. §§ 12117(a), 2000e-5(f)-(g), 1981a. The EEOC provided Turner with a right-to-sue letter.

Turner sued BNSF, claiming BNSF violated the ADA when it failed to recertify him as a conductor due to his purported disability, color deficiency. Specifically, Turner asserts BNSF's field test did not mimic what he must see in the field as a conductor, and had the test accurately reflected real-life conditions, he would have passed. Turner also alleged that BNSF's medical examiner should have recertified him based on his fifteen years of experience with the railway, which he believes proves he has sufficient eyesight to safely conduct a train, despite failing the two vision tests.

BNSF moved for judgment on the pleadings. The district court granted that motion on two grounds: (1) that Turner was not a "qualified individual" under the ADA and (2) preclusion. Turner timely appealed.

_____

[4] Per the federal regulations Best Practices for Designing Vision Field Tests, BNSF did not permit Turner to wear chromatic lenses for this test. 49 C.F.R. Parts 240 and 242, Best Practices for Designing Vision Field Tests for Locomotive Engineers and Conductors.

No. 24-10031

## II.

We review the district court's judgment on the pleadings *de novo*. *See Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008); Fed. R. Civ. P. 12(c). A 12(c) motion for judgment on the pleadings "is subject to the same standard as a motion to dismiss under Rule 12(b)(6)." *Doe*, 528 F.3d at 418. "The central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief." *U.S. v. 0.073 Acres of Land*, 705 F.3d 540, 543 (5th Cir. 2013) (quoting *Brittan Commc'ns Int'l Corp. v. Sw. Bell Tel. Co.*, 313 F.3d 899, 904 (5th Cir. 2002)).

## III.

Title I of the ADA prohibits employment discrimination against "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). To make out a prima facie case of discrimination, Turner most show, among other things, he was "qualified" for the job. *Cannon v. Jacobs Field Servs. N.A., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016). "Qualified individual" means "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Whether Turner is ultimately qualified, and can make out a claim for discrimination under the ADA, depends in-part on a certification according to a process mandated by the FRA exercising authority delegated by the Secretary of Transportation.[5] Because Turner was denied that certification, and he never exhausted the administrative appeals process available to him, he fails to establish that essential element for a prima facie case of discrimination under the ADA.

---

[5] To be a "qualified individual" one must possess the licensing and certification that is required for their job. 29 C.F.R. § 1630.2(m); Part 1630 Appendix; *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 & n.14 (5th Cir. 1997).

## A.

Conductor certification, including the attendant vision examinations, is not a job qualification of BNSF's own devising. This job requirement comes from federal law and FRA regulations which are binding on BNSF.

The Federal Railroad Safety Act (FRSA), 49 U.S.C. § 20103(a), authorizes the Secretary of Transportation to issue nationally uniform regulations and orders covering every area of railway safety. *Lane v. R.A. Sims, Jr.*, 241 F.3d 439, 442 (5th Cir. 2001); 49 U.S.C. § 20103(a). One essential aspect of railroad safety is "the health and fitness of covered employees." *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 627 (1989).[6] Enter the Rail Safety Improvement Act, which amended the FRSA to allow the Secretary of Transportation to "establish a program requiring the licensing or certification . . . of any operator of a locomotive." 49 U.S.C. § 20135(a). This amendment required that the program established by the Secretary "be carried out through review and approval of each railroad carrier's operator qualification standards." *Id.* § 20135(b)(1).

As permitted by the FRSA, the Secretary delegated to the FRA the ability to certify locomotive operators. *Id.* § 20107(a)(2) (The Secretary may "delegate to a . . . qualified person the inspection, examination, and testing of railroad . . . persons."); 49 C.F.R. § 1.89. The FRA published certification qualifications with the goal of ensuring "that only those persons who meet

---

[6] Railway "operation requires the use of instruments and agencies attended with special risks and dangers, the proper management of which involves peculiar knowledge, training, skill, and care." *Smith v. Alabama*, 124 U.S. 465, 481–82 (1888). "The costs of a misstep can be serious: loss of human life or property, toxic environmental damage, and the infinite litigation that follows in their wake." *Coffey v. Norfolk S. Ry. Co.*, 23 F.4th 332, 337 (4th Cir. 2022). Therefore, railways are charged with a "very strict responsibility" of preventing damage. *Shoemaker v. Kingsbury*, 79 U.S. 369, 376 (1870).

minimum federal safety standards serve as conductors, to reduce the rate and number of accidents and incidents, and to improve railroad safety." Fed. R.R. Admin., *Conductor Certification*, 76 Fed. Reg. 69802 (2011). After all, the FRA's lodestar is safety. *See* 49 U.S.C. § 103(c) (The FRA must "consider the assignment and maintenance of safety as the highest priority," consistent with Congress's intent of furthering "the highest degree of safety in railroad transportation.").[7] A conductor who fails to receive a certification according to FRA regulations cannot operate a train, and no policy BNSF enacts can change this requirement.

Although portions of the certification process are implemented by railways themselves, like BNSF, the process—including vision test approval, 49 C.F.R. §§ 240.121 and 240.103—is within the province of the FRA. Take first the substantive requirements of the vision tests that they ensure a conductor's ability to see color. FRA regulations require railways to confirm that conductors possess "[t]he ability to recognize and distinguish between the colors of railroad signals as demonstrated by successfully completing one of the tests." 49 C.F.R. §§ 240.121(c)(3); 242.117(h)(3); Part 240 Appendix F; Part 242 Appendix D. This requirement is not optional for BNSF.

The FRA's certification process includes two opportunities to pass a vision test. The first test is a standardized clinical vision test. *Id.* If the applicant fails that test, he or she may, upon request, be given a second, different, vision test. 49 C.F.R. §§ 240.101, 240.121, 242.117; Part 240

---

[7] The National Transportation Safety Board (NTSB) is responsible for investigating significant transportation accidents, including railway accidents. In multiple major train accidents, the NTSB has determined that the probable cause of the accident was the train crew's inability to correctly perceive the railway signals, which heavily rely on color.

Appendix F; Part 242 Appendix D.[8] The railway must submit that second test to the FRA for approval. 49 C.F.R. §§ 240.101; 240.103; Part 240 Appendix B; Part 242 Appendix B.[9]

BNSF chose to use a field test for Turner's second test. Although BNSF could choose that test, again, the FRA has the sole authority to approve it. *Id.* And although a railway's medical examiner has the discretion to construct the second test, *id.*, the field test must follow the FRA's regulations. Those regulations, among other things, require each locomotive conductor to recognize and distinguish between the colors of signals relevant to the particular railway. 49 C.F.R. §§ 240.121(c)(3); 242.117(h)(3); Part 240 Appendix F; Part 242 Appendix D. The test conditions must "reasonably match" the operating and working conditions the conductor will experience in the field, which differ between railways. 49 C.F.R. Parts 240 and 242, Best Practices for Designing Vision Field Tests for Locomotive Engineers and Conductors.

Even the fallback provision in the FRA regulations does not give BNSF a workaround to the substantive requirements of the FRA's regulations. That fallback provision gives a medical examiner some discretion

---

[8] The FRA's rationale in providing the second vision test is "not to provide an examinee with the right to make an infinite number of requests for further evaluation, but to provide an examinee with at least one opportunity to prove that a hearing or vision test failure does not mean the examinee cannot safely operate a locomotive or train." *Id.*

[9] Although we do not evaluate the substance of the FRA's regulations, we note that one issue Turner raises with BNSF's field test is that he was not permitted to wear chromatic lenses during the test. However, Turner admitted at oral argument that he is also not allowed to wear chromatic lenses while conducting a locomotive. Therefore, under the FRA's regulations, BNSF's field test did not deviate from the real-world conditions in prohibiting Turner from wearing chromatic lenses. Further, we note, the Best Practices for Designing Vision Field Tests directs that railways should prohibit chromatic lenses when testing an individual's vision for a conductor certification. 49 C.F.R. Parts 240 and 242, Best Practices for Designing Vision Field Tests for Locomotive Engineers and Conductors.

to certify a conductor, but he may only do so if he deems it would be safe for him or her to conduct a train. 49 C.F.R. § 242.117(j). No matter what, whether an applicant can be certified is defined by the FRA's regulations. And if an applicant fails two vision tests, and is not certified by a medical examiner, the railway has no option but to decline certification under federal law.

Turner failed the FRA-required vision tests and BNSF's medical examiner refused to certify him according to the FRA's standards under the fallback provision. So, BNSF had no option but to refuse to recertify Turner and prohibit him from operating as a conductor because he did not meet the FRA's certification requirements. BNSF's hands were tied. Turner failed to obtain the government-mandated certification that would make him qualified to be a conductor. However, as we next explain, Turner could avail himself of the FRA's administrative process.

**B.**

Because the FRA's regulations prohibited BNSF from recertifying Turner when he failed two vision tests and was not cleared as safe to conduct a train by the railway's medical examiner, any disagreement Turner has with BNSF's decision not to recertify him as a conductor is under the purview of the FRA. But Turner never gave the FRA a chance to have a final say on whether he should be certified. We first elaborate on the FRA's appeals process that Turner failed to pursue, then we explain why failure to exhaust this process, coupled with failure to obtain the federally required conductor certification, means Turner failed to show he is a "qualified individual" under the ADA.

**1.**

Employees whose conductor certification applications are denied by their employers are not without recourse. The FRA has an appeals process

by which conductor applicants like Turner can seek review of negative determinations by their employers administering FRA regulations. *See* 49 U.S.C. § 20135(b)(1); 49 C.F.R. §§ 240.401(a); 242.501–.511. The appeals process has three layers of review. First, the FRA's Operating Crew Review Board (OCRB) reviews the denial. 49 C.F.R. Part 240.401(b), 242.501(b). It considers (1) whether the railroad's finding was supported by substantial evidence; (2) whether the railroad failed to follow proper procedures causing substantial harm; and (3) whether the railroad made correct legal interpretations. 49 C.F.R. §§ 240.405(h)–(j), 242.505(h)–(j).

If the OCRB affirms the railway's decision, the applicant can appeal the decision yet again, to a presiding officer who considers all relevant facts and determines the correct application of Part 240 or 242 to the circumstances presented. 49 C.F.R. §§ 240.409(c), 242.509(c). Finally, if the presiding officer affirms, the applicant can appeal to the FRA Administrator. 49 C.F.R. §§ 240.411(e), 242.511(e). "The Administrator may remand, vacate, affirm, reverse, alter, or modify the decision of the presiding officer. . ." *Id.*

Additionally, the FRA Administrator's decision may be appealed directly to the appropriate U.S. Circuit Court of Appeals. *See Daniels v. Union Pac. R. Co.*, 530 F.3d 936, 941 (D.C. Cir. 2008). The Hobbs Act gives United States Court of Appeals (other than the United States Court of Appeals for the Federal Circuit) "exclusive jurisdiction" to "determine the validity of" all "final orders" of the Secretary of Transportation related to railway safety, including actions related to the certification of locomotive conductors. 28 U.S.C. § 2342(7).

It is undisputed that Turner did not attempt even step one of this process.

**2.**

No. 24-10031

The FRA's appeals process underscores why this Court requires exhaustion. By law, BNSF could not employ Turner because he did not obtain the FRA-required certification according to its implementation of the substantive and procedural requirements promulgated by FRA regulations. *See* 49 U.S.C. § 20135; 49 C.F.R. §§ 240.121(c)(3); 242.117(h)(3); Part 240 Appendix F; Part 242 Appendix D.[10] If Turner believes that he deserves certification despite BNSF's efforts to comply with the rules, he must go to the font of that decision- and rule-making authority: the FRA. That is why this court has required administrative exhaustion in cases like this where an employment action was based on the failure to satisfy standards established by statute or regulation. *See Williams v. J.B. Hunt Transport*, 826 F.3d 806, 811 (5th Cir. 2016).

This exhaustion requirement is especially important if a plaintiff alleges that a federal regulation, or a private party's administration of it, might violate a nondiscrimination statute like the ADA, as Turner does here. Without an exhaustion requirement, "employers would face the dilemma of risking ADA liability or violating the [agency's] command that" employees, like drivers of motor carriers, must be "qualified under the agency's safety regulations." *Id.* at 811 (internal quotation marks omitted). After all, the agencies have "greater expertise in applying [their] []certification regulations." *Id.*

We refuse to force employers into a choice between the rock of ADA liability and the hard place of regulatory violation. On that principle, we are joined by at least two circuits: the Third and the Fourth. *See, e.g.*, *McNelis v. Pa. Power & Light Co.*, 867 F.3d 411, 416 n.2 (3d Cir. 2017) (refusing to force

---

[10] No doubt, if BNSF did ignore federal requirements, and a train wreck resulted, BNSF "would be told under the unremitting glare of hindsight of all it should have done." *Coffey*, 23 F.4th at 341.

an employer "to pick between ADA liability on the one hand and administrative penalties on the other"); *Coffey*, 23 F.4th at 340 ("[T]he ADA does not countermand the railroad's unconditional obligation to follow the regulations and its consequent right to do so." (internal quotation marks omitted)). Additionally, the Supreme Court has explained, "[w]hen Congress enacted the ADA, it recognized that federal safety rules would limit application of the ADA as a matter of law." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 573 (1999).

In *Williams* we described our exhaustion requirement's support from two sister circuits. Both "have rejected commercial drivers' ADA claims when . . . a doctor found the plaintiff medically unqualified [as required by federal regulations] and the plaintiff did not obtain a contrary opinion through the DOT's administrative process." 826 F.3d at 811. *See Harris v. P.A.M. Transp., Inc.*, 339 F.3d 635, 638–39 (8th Cir. 2003); *King v. Mrs. Grissom's Salads, Inc.*, No. 98-5258, 1999 WL 552512, at *3 (6th Cir. 1999).[11] Here as in *Williams*, and other circuits, failure to receive a certification required by federal law, and the failure to exhaust administrative remedies related to that certification, means the plaintiff, here Turner, cannot show he is a "qualified individual" under the ADA.

At the end of the FRA's appeals process is permission for a direct appeal to a United States Court of Appeals. Allowing Turner's ADA claim to proceed in district court prior to him participating in the administrative review process takes the review of a denial of a conductor certification out of the "exclusive jurisdiction" of the federal courts of appeal and improperly places it in the hands of a federal district court. *See* 28 U.S.C. § 2342(7).

---

[11] The Seventh Circuit has similarly held that a plaintiff was not a "qualified individual" and thus could not bring an ADA claim when he lacked an agency-required certification. *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 973–76 (7th Cir. 2000).

No. 24-10031

\*\*\*

Turner is not a "qualified individual" under the ADA because he lacks the FRA-required certification and fails to exhaust his administrative remedies made available by the very federal regulations under which he seeks a benefit.[12]

## IV.

We AFFIRM the district court's judgment because Turner is not a "qualified individual" under the ADA.

_____

[12] Because we hold that Turner is not a "qualified individual" and so, at this time cannot bring an ADA claim in this court, we decline to reach the preclusion issue addressed by the district court's opinion.

No. 24-10031

JAMES E. GRAVES, JR., *Circuit Judge*, dissenting.

I disagree with the majority's conclusion that Tracy Turner is not a qualified individual who can bring an action under the Americans with Disabilities Act (ADA). I also disagree with the majority's conclusion that there is an administrative exhaustion requirement. Because I would vacate and remand, I respectfully dissent.

Turner, who has a color-vision deficiency, worked as a conductor for BNSF for some fifteen years. In 2020, BNSF refused to recertify Turner as a conductor and effectively terminated him after he failed BNSF's color-vision field test, which was designed and administered by BNSF under the discretion afforded by the Federal Railroad Safety Act (FRSA) and the Federal Railroad Administration (FRA). *See* 49 U.S.C. § 20101 et seq. After filing a charge with the Equal Employment Opportunity Commission (EEOC) and obtaining a right-to-sue letter, Turner filed suit under the ADA alleging that BNSF's testing procedure discriminated against him based on a disability. *See* 42 U.S.C. § 12112(a). The district court granted BNSF's motion for judgment on the pleadings, finding that Turner could not show he was qualified because he was denied recertification after failing the test and he failed to exhaust the administrative remedies. His suit was dismissed with prejudice. *Turner v. BNSF Railway Co.*, No. 4:23-cv-00681-P, 2023 WL 9052248, at **1, 4 (N.D. Tex. Dec. 22, 2023). Turner appealed.

The majority concludes that the district court correctly held that Turner is not a qualified individual under the ADA because he lacks the required certification and did not seek review of his denied recertification under the FRA's administrative dispute resolution procedures.[1] I disagree.

---

[1] The district court also erroneously found that FRA regulations precluded Turner's ADA lawsuit against BNSF. The majority states: "Because we hold that Turner

Railroad conductors are required to take vision tests every three years for certification to assess whether they have sufficient visual acuity to recognize and distinguish colored railroad signals. *See* 49 C.F.R. § 240.117. Employees initially take a clinical exam, such as the Ishihara (14 plate) test, without chromatic lenses. *See* 49 C.F.R. pt. 240, app. F(2)-(3); *see also* 49 C.F.R. § 240.121(c)(3). Employees who do not pass the initial exam are sent to the railroad's medical examiner for further evaluation that may include "[o]phthalmologic referral, field testing or other practical color testing" with or without chromatic lenses. 49 C.F.R. pt. 240, app. F(4); *see also* 49 C.F.R. § 240.121(e). Examinees who fail the Ishihara test can receive additional evaluation, which can include a field test. *See* 49 C.F.R. § 242.117(j). Up until 2020, Turner failed the Ishihara test but passed BNSF's color-vision test and consistently received his certification.[2] In 2020, BNSF had Turner take the Ishihara test, which he failed. BNSF then had Turner take a second test, which was a field test that it had designed, but prohibited him from wearing chromatic lenses that would have helped him distinguish the signals being displayed. Turner failed the second test, which he asserts "did not replicate real world conditions" and bore little resemblance to what he actually saw on the job. BNSF then refused to recertify Turner as a conductor, basing that decision solely on the flawed color-vision test results, as alleged by Turner.

------

is not a 'qualified individual' and so, at this time cannot bring an ADA claim in this court, we decline to reach the preclusion issue addressed by the district court's opinion." Regardless, the issues are intertwined, and the district court erred. Turner's ADA lawsuit is clearly not precluded.

[2] The majority asserts that "nor does [Turner] claim to have passed equivalent tests in the past during his tenure with BNSF Railway." This statement presumes that the field test is not equivalent to the scientific test. Turner asserts that he "passed BNSF's color-vision field test and was certified by BNSF to work as a conductor every year it tested him until 2020."

Turner asserts that nothing had changed in his vision since the last time he had taken and passed BNSF's field test. He also asserts that he would have again passed if BNSF had used a test that actually reflected real world conditions. Further, Turner asserts that his history of safely performing his job and the fifteen years' worth of evidence showing that he successfully distinguished between railroad signals should have been sufficient for BNSF to recertify him.

The FRA contains an optional administrative review process for conductors who have been denied recertification. *See* 49 U.S.C. § 20135(b)(1); *see also* 49 C.F.R. §§ 242.501-.511. Turner instead filed a charge with the Equal Employment Opportunity Commission (EEOC) – the only administrative remedy that he was required to exhaust before filing an ADA action. *See* 42 U.S.C. §§ 12117(a), 2000e-5(f)-(g), 1981a.

The majority concludes that Turner cannot bring an ADA claim if he is not "qualified," and essentially equates being qualified with successfully obtaining the federally required conductor certification. The majority asserts that, "[t]o be a 'qualified individual' one must possess the licensing and certification that is required for their job. 29 C.F.R. § 1630.2(m); Part 1630 Appendix; *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 & n.14 (5th Cir. 1997)." But none of those sources cited by the majority say that successfully obtaining a license or certification in a situation such as this determines whether an individual is qualified.

Section 1630.2(m) states, in relevant part: "The term 'qualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m).

15

There is a reference to "licenses, etc." in the appendix under § 1630.2(m). But the interpretive guidance explains, "[f]or example, the first step in determining whether an accountant who is paraplegic is qualified for a certified public accountant (CPA) position is to examine the individual's credentials to determine whether the individual is a licensed CPA. This is sometimes referred to in the Rehabilitation Act caselaw as determining whether the individual is otherwise qualified' for the position." 29 C.F.R. pt. 1630, app. § 1630.2(m).[3]  There is no suggestion here that Turner is not "otherwise qualified."  Moreover, the guidance is not applicable here because BNSF exercised discretion in determining what tests Turner would be given to obtain the required recertification.

*Foreman* does not mention the word "license" or "licensing." Instead, the discussion on the page cited by the majority concerns whether the ADA requires an employer to take an action inconsistent with the contractual rights of other workers under a collective bargaining agreement (CBA) to accommodate a disabled individual.  It has no relevance here. *Id.* at 810.  Further, the footnote cited simply states the following general law:

> The determination of qualification is two-fold: (1) whether the individual meets the necessary prerequisites for the job, such as education, experience, skills, and the like; and (2) whether the individual can perform the essential job functions, with or without reasonable accommodation. *See* 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m)(1994).

*Foreman*, 117 F.3d at 810, n.14.  To the extent that the majority may be reading "licensing" into the above, *Foreman* is easily distinguishable.

---

[3] There is also a reference to "§ 1630.9 Not Making Reasonable Accommodation." 29 C.F.R. pt. 1630, app. § 1630.2(m).

Earl Foreman worked as a level seven expeditor, which entailed delivering necessary materials and supplies to two large buildings or shops containing some 400 welding machines and three electrical sub-stations. *Id.* at 802-03. Foreman underwent heart surgery and had a pacemaker installed, after which he was medically restricted by his doctor from working within six feet of any welding equipment and within 40-50 feet of any power lines. *Id.* at 803. Those limitations precluded Foreman from working in the shop areas. While Foreman was still on leave, he filed a charge with the EEOC alleging that his employer had discriminated against him by not allowing him to return to work as an expeditor and by failing to reasonably accommodate him with a new position at comparable pay. *Id.*

The employer then met with Foreman to discuss his return to work but ultimately denied both of his requests. *Id.* The employer maintained that Foreman could not perform the essential functions of working in the shops because of his medical restrictions, and that it could not offer him other requested positions because they either did not exist or were covered by the "bona fide seniority provisions" of the CBA. *Foreman*, 117 F.3d. at 803. The employer then offered Foreman the position of level 1 janitor, which he had previously held and which it maintained was the only position it could offer based on his qualifications, medical restrictions, job availability, and the seniority provisions of the CBA. *Id.*

Foreman accepted the janitor position but filed a federal suit alleging a violation of the ADA by failing to accommodate his alleged disability. *Id.* The case was tried before a jury, and at the close of all evidence, the district court granted the employer's renewed motion for judgment as a matter of law. *Id.* The district court held that no reasonable juror could find that Foreman was a qualified individual with a disability because he could not perform essential functions of his job with or without accommodations. *Id.* at 803-04. The district court also found that it was not a reasonable

accommodation to require the employer to eliminate an essential job function or create a new job. *Id.* at 804. The district court did not address whether the "bona fide seniority provisions" of the CBA prevented the employer from giving Foreman a new job. On appeal, this court affirmed the district court, concluding that Foreman failed to establish that he was disabled, failed to establish that he was a qualified individual with a disability, and that his requested accommodations were not reasonable.

Unlike Foreman, Turner did not develop a condition or undergo a procedure that suddenly led to a disability. Turner had the same disability the entire time he worked for BNSF, and he had successfully and safely performed his necessary duties with that disability for fifteen years. Significantly, there is no suggestion that Turner's condition somehow changed or worsened, and Turner explicitly states that his vision has not changed. Additionally, unlike Foreman, Turner was not allowed to put forth his full case.

The majority asserts that "[t]he FRA's appeals process underscores why this [c]ourt requires exhaustion." But this court does not require exhaustion. The majority also asserts that, "[b]y law, BNSF could not employ Turner because he did not obtain the FRA-required certification according to its implementation of the substantive and procedural requirements promulgated by FRA regulations." The majority then notes, "[n]o doubt, if BNSF did ignore federal requirements, and a train wreck resulted, BNSF 'would be told under the unremitting glare of hindsight of all it should have done.' *Coffey[v. Norfolk S. Ry. Co.*, 23 F.4th 332, 341 (4th Cir. 2022)]."[4] This note points out one of the flaws in the majority's analysis. Turner did not ask or expect BNSF to ignore any requirements. He is also

—————————————————

[4] *Coffey* is factually dissimilar and not controlling authority.

not arguing that there should be no certification process. Turner's action is based on his argument that BNSF used a discriminatory test to deny his recertification.

The majority further asserts that:

> If Turner believes that he deserves certification despite BNSF's efforts to comply with the rules, he must go to the font of that decision- and rule-making authority: the FRA. That is why this court has required administrative exhaustion in cases like this where an employment action was based on the failure to satisfy standards established by statute or regulation. *See Williams v. J.B. Hunt Transport*, 826 F.3d 806, 811 (5th Cir. 2016).

This demonstrates another flaw in the majority's analysis. This court did not require administrative exhaustion in *Williams v. J.B. Hunt Transport, Inc.*, 826 F.3d 806 (5th Cir. 2016), as discussed below, and specifically concluded that any such exhaustion requirement would not be jurisdictional. *Id.* at 810.

The majority states that, "[w]ithout an exhaustion requirement, 'employers would face the dilemma of risking ADA liability or violating the [agency's] command that' employees like drivers of motor carriers, must be 'qualified under the agency's safety regulations.'" The majority is quoting from *Williams*, 826 F.3d at 811, which was also cited by the district court and is discussed more fully below. The majority then concludes that "the failure to exhaust administrative remedies related to that certification, means the plaintiff, here Turner, cannot show he is a 'qualified individual' under the ADA." I disagree.

Much like Foreman, and unlike Turner, the plaintiff in *Williams* suddenly developed a medical condition. Jimmie Williams began working as a commercial driver for J.B. Hunt in 1999. In May of 2010, Williams fainted at home and was diagnosed with syncope and ventricular tachycardia. *Id.* at

808-09. Under the applicable Department of Transportation (DOT) regulations, a person is not qualified to drive a commercial vehicle for various reasons, including a diagnosis of "a cardiovascular disease of a variety known to be accompanied by syncope," or a "condition which is likely to cause loss of consciousness or any loss of ability to control a commercial motor vehicle." *Williams*, 826 F.3d at 808.

Williams then visited a second doctor without disclosing the earlier diagnosis to obtain his necessary DOT certification. *Id.* at 809. When J.B. Hunt forwarded the first doctor's evaluation to the second doctor's office, a third doctor in that office rescinded Williams' DOT certification. The issue then became conflicting medical evaluations, which was also addressed in the applicable DOT regulations. *Id.* at 808. J.B. Hunt then sought additional medical information from Williams that he never provided. *Id.* at 809. Williams was eventually administratively terminated, and subsequently filed a charge with the EEOC. *Id.* Upon receipt of his right-to-sue letter, Williams filed suit under the ADA. *Id.* J.B. Hunt filed a motion to dismiss for lack of subject-matter jurisdiction based on failure to exhaust administrative remedies, or in the alternative, for summary judgment. *Id.* The district court granted the motion on subject-matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure because Williams failed to exhaust his administrative remedies by initiating the process for resolution of conflicting medical evaluations under the DOT regulations. *Id.* at 810.

On appeal, this court reiterated that "no statute requires such exhaustion." *Id.* After noting that this circuit has not yet determined whether to impose the exhaustion requirement, this court said that "any such requirement would not be jurisdictional" based on Supreme Court precedent *Id.* (citing *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011)). This court further said that it has "corrected district courts that have treated as

jurisdictional administrative exhaustion requirements not mandated by any statute's text." *Williams*, 826 F.3d at 810. This court then concluded:

> No statute requires that an ADA plaintiff exhaust the § 391.47 process before filing a lawsuit, [*Campbell v. Fed. Express Corp.*, 918 F.Supp. 912, 918 (D. Md. 1996)] let alone does so in jurisdictional terms, *see Henderson*, 562 U.S. at 438. Thus, the district court should not have dismissed this ADA claim for lack of subject-matter-jurisdiction.

*Id.* This court then affirmed only on the alternative argument of summary judgment, concluding that there was no genuine dispute of any material fact under Rule 56(a) of the Federal Rules of Civil Procedure. *Id.* Here, there is a genuine dispute of material fact.

The majority's discussion regarding the administrative review process does not establish that Turner was required to exhaust. Further, the citation of the Hobbs Act in support of exhaustion confuses multiple theories and issues, much like the same argument in BNSF's brief. This is not a "final action" of the Secretary of Transportation. *See* 28 U.S.C. § 2342(7). This is BNSF's decision to use what Turner asserts is a discriminatory test to deny his recertification. There is simply no basis for eliminating the application of the ADA to employees who need some sort of certification from their employers. Doing so is particularly egregious here, where Turner was a "qualified individual" for fifteen years with the same condition. Neither Turner nor the applicable regulations changed – only BNSF's test changed, and in doing so, Turner asserts that he was discriminated against and denied the necessary accommodations he had been provided in the past. Under the ADA, a "qualified individual" simply "means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position." *See* 42 U.S.C. § 12111(8). Turner meets that definition. Because I would vacate and remand, I respectfully dissent.